UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry Dean PERRY,
Defendant-Appellant.

No. 86–1978.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1986.

Decided March 30, 1987.

Gregory Collins, Collins & Flynn, Springfield, Ill., for defendant-appellant.

Patrick J. Chesley, U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before WOOD, and POSNER, Circuit Judges, and WILL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

On December 17, 1985, a three-count indictment was filed charging the defendant, Larry Dean Perry, with breaking into a post office in violation of 18 U.S.C. § 2115 (1982), stealing mail from the post office in violation of 18 U.S.C. § 1708 (1982), and receiving and possessing stolen mail in violation of 18 U.S.C. § 1708. The indictment stemmed from a break-in which occurred at the Findlay, Illinois, Post Office sometime between 5:00 p.m. on May 22, 1984, and 5:30 a.m. May 23, 1984. A superseding indictment was filed March 24, 1986, charging Perry with the original three offenses and adding a fourth count charging defendant with breaking into a mail collection box in violation of 18 U.S.C. § 1705 (1982).

Perry moved to dismiss the indictments for pre-indictment delay and to suppress evidence. The district court denied these motions.

After a jury trial, Perry was found guilty of counts I, II, and IV of the superseding indictment,[1] and was sentenced to five years imprisonment for each of counts I

and II, and three years imprisonment for count IV, all sentences to be served consecutively.

Perry appealed the judgment and sentence. We affirm.

## I. FACTUAL BACKGROUND

The Findlay, Illinois, Post Office was burglarized sometime between 5:00 p.m. May 22, 1984, and 5:30 a.m. May 23, 1984. The front door, which was plate glass, was broken. The collection box in front of the post office also had been pried open. Mail had been stolen from each location.

Findlay Police Chief John Love arrived at the post office at about 5:30 a.m. May 23, 1984, and began to investigate the break-in. When he came to the rear of the post office, he saw the defendant Perry burning trash in the alley not far from the post office. Perry and his girlfriend, Debra Fairbanks, lived in a house four doors away from the post office. Postal Inspector Kenneth Cope soon arrived to investigate as well. Inspector Cope found footprints near the post office and shoe impressions on broken glass inside the door.

A witness reported to Chief Love that he saw Perry load his trash barrel into the trunk of Perry's car and drive away with it. When Perry returned, Chief Love, Inspector Cope, Shelby County Sheriff Robert Collins, and another county officer, Jim Giles, questioned him at his residence. The officers explained to Perry that they were investigating a break-in at the post office. When asked where he had taken his trash, Perry told the officers that he had dumped it in a creek southeast of Findlay. He agreed to take them to the location. Perry drove his car accompanied by Fairbanks and her daughter; the officers followed.

Perry stopped along the way to put gas in his car. As Perry knelt to pump gas into the rear of the car, Inspector Cope noticed that the tread on Perry's tennis shoes was very similar to the shoe impressions left on

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The district court instructed the jury not to consider count III if they found the defendant guilty of count II.

broken glass found inside the post office. Perry then led the officers to the spot where he had dumped the trash on a dead-end road. Contrary to what Perry had told the officers, the site was not near any water.

When the officers found partially burnt mail that did not belong to either Perry or Fairbanks, they advised Perry of his *Miranda* rights. Perry agreed to answer questions about the post office burglary. Inspector Cope showed Perry a piece of the glass with a shoe impression on it. The officers noticed that Perry, who was wearing shorts, had scratches on the back of his right leg. When asked about the scratches, Perry said that a cat had scratched him.

Perry and the officers returned to Perry's residence. Sheriff Collins questioned Fairbanks's nephew, Jimmy Minch, who was staying at the house, then the officers searched the house with Fairbanks's permission. Perry also consented to a search of his car, but neither search produced any evidence. While at the house, Perry changed into some long pants and gave his tennis shoes to Inspector Cope. Inspector Cope again asked Perry about the scratch on his leg, and Perry attributed it to a falling glass, then to his action in picking up the pieces of the glass after it broke. Perry agreed to accompany the officers to the Shelby County Sheriff's Office. On the way to the Sheriff's Office, Perry told Officer Love that the scratches on his leg were not from a cat but were instead from a piece of glass. At the Sheriff's Office, Inspector Cope gave Perry a receipt for his tennis shoes and took some pictures of Perry's leg.

Inspector Cope sent Perry's shoes and some of the broken glass to the Postal Inspection Service Laboratory in Washington, D.C. The lab reported that the tread pattern on Perry's shoes matched that found on the broken glass inside the post office, and glass fragments found in Perry's shoes were exactly like the glass that was broken at the post office.

Inspector Cope testified that he received the lab reports in November, 1984. He informed the United States Attorney's Of-fice of his findings March 22, 1985, following up with a written report on April 12, 1985. Inspector Cope was called to testify before the grand jury on December 17, 1985, the date the indictment was returned, and he was the only person to testify. Although he said the delay in indicting Perry was not caused by his failure to investigate the case diligently, Inspector Cope was not able to give any reason for the delay.

After Perry was indicted, Dr. Jerry L. Boyd, a clinical psychologist, examined him to determine his competence to stand trial. Dr. Boyd found that Perry was competent.

The defense counsel moved to dismiss the indictment for pre-indictment delay and to suppress evidence, specifically, Perry's tennis shoes. The district court denied the motions, and Perry's trial commenced April 7, 1986.

Perry testified at trial that he did not break into the post office. He said that some friends came over to his house about 9:00 p.m. May 22, 1984, and stayed until 2:30 or 3:00 the following morning. Perry got up at 6:00 a.m. and, putting on a pair of tennis shoes he found, went out to burn his trash. He then dumped the trash in the country. Although he admits that he told officers several different stories about the scratches on his leg, Perry testified in court that his scratches were from an exposed spring in a couch. Fairbanks corroborated this testimony.

After a two-day trial, the jury convicted Perry of breaking into the Findlay Post Office and the collection box, and of stealing mail.

## II. DISCUSSION

### A. Pre-indictment Delay

Perry argues on appeal that because the government delayed unduly before indicting him, the district court should have dismissed the indictment. Perry was questioned on May 23, 1984, but was not contacted again until April of 1985, when he received a letter informing him that he was still under investigation. He was not indicted until December 17, 1985, nineteen

months after the original investigation. Perry argues that this delay was for the government's tactical advantage only, and prejudiced him in his ability to present a defense.

■ Statutes of limitations are a defendant's primary protection against being charged for crimes committed in the too-distant past. *United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984). The due process clause, however, also "has a limited role to play in protecting against oppressive delay." *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *see also Gouveia,* 467 U.S. at 192, 104 S.Ct. at 2299; *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). When analyzing a defendant's motion to dismiss an indictment for pre-indictment delay, a court must look at the degree of prejudice the delay caused the defendant, and the government's reason for the delay. "Due process is violated when the government delays an individual's prosecution solely for strategic purposes and that delay substantially prejudices the defense." *United States v. Jones,* 808 F.2d 561, 567 (7th Cir.1986); *United States v. Watkins,* 709 F.2d 475, 479 (7th Cir.1983).

■ Defendants in other cases in this circuit have met with little success in trying to establish the requisite level of prejudice. "The actual prejudice to the defendant ... must be so substantial as to outweigh the preferable deference to legitimate prosecutorial priorities and bureaucratic realities." *United States v. Williams,* 738 F.2d 172, 175 n. 2 (7th Cir. 1984). Clearly, the mere passage of time is not enough. *See United States v. Brock,* 782 F.2d 1442 (7th Cir.1986) (delay of more than four years); *Williams,* 738 F.2d 172 (four-year delay); *Watkins,* 709 F.2d 475 (sixteen months); *United States v. Solomon,* 688 F.2d 1171, 1179–80 (7th Cir.1982) (more than three years). Even the death of defense witnesses may not cause sufficient prejudice to outweigh the court's deference to the government's prosecutorial decisions. *See Williams,* 738 F.2d at 176 (death of defense witness did not cause "actual and substantial" prejudice to defense); *Solomon,* 688 F.2d at 1179–80 (death of two defense witnesses did not establish actual prejudice to defense).

■ Perry has argued that the nineteen-month delay in this case was peculiarly prejudicial to him because it aggravated his preexisting personality disorders. Dr. Boyd testified at the hearing on defendant's motion to dismiss the indictment that Perry suffered from a borderline personality disorder and that an organic personality syndrome had resulted from his continuous use of drugs over a period of time. Although these two conditions were chronic and predated the charges in this case, they made it more difficult, he testified, for Perry than for the average person to function and cope. Dr. Boyd also said that Perry was suffering from depression caused by the charges filed against him.

Perry testified that in April, 1985, when he found out he was still under investigation for the post office burglary, he became very frustrated and anxious, and his personal life with his girlfriend and children became tense. As time went on with no resolution of the investigation, Perry resumed mental health counseling.

Dr. Boyd testified that because of Perry's preexisting personality disorders, Perry would be expected to have more anxiety and paranoia than a person without this diagnosis. According to Dr. Boyd, "[t]here is a questionable adequacy of his capability to testify relevantly in his own behalf due to the presence of anxiety and paranoia." Perry argues that the diminution in his ability to testify amounted to actual and substantial prejudice.

The district court disagreed and denied the defendant's motion to dismiss the indictment because it found that Perry had failed to demonstrate prejudice. This denial was proper. Although Dr. Boyd testified that Perry would be unable to testify in his own behalf as well as he could without his mental disorder, he did not find Perry incompetent to stand trial. He also testified that much of Perry's stress was attributable to the fact of being charged

with a crime; it did not result solely from the delay between investigation and indictment.

Dr. Boyd found that Perry's organic personality syndrome and borderline personality disorder predated the criminal charges brought against Perry. Perry's depression was a reaction to the charges that anyone could be expected to experience. Dr. Boyd testified that the depression was not exacerbated by Perry's preexisting mental condition, but may have been exacerbated by "the announcement of charges in the first place, a period of effort of adjustment, and then reannouncement of charges." Dr. Boyd went on to say that he did not distinguish between Perry and "the normal population" that would also experience depression in like circumstances, except to note that Perry's coping skills were not as good as those of the average person. According to Dr. Boyd, however, these skills in Perry's case had never been good and were unlikely to improve. Taken as a whole, this testimony does nothing more than suggest that Perry suffered the same stress and depression that anyone else facing charges might experience, but that he did not cope with the situation as well as others would. This does not rise to the level of actual and substantial prejudice, and, in fact, has very little to do with the delay at all.

■ Perry also argues that because of the delay between the investigation and the indictment, he was unable to locate Jimmy Minch, who presumably would have testified in Perry's behalf. As we have already mentioned, the death of defense witnesses has not been sufficient to demonstrate actual and substantial prejudice to defendants; the inability to locate a witness is certainly no more prejudicial than his death. Perry has not shown much initiative in trying to find Minch: Fairbanks testified only that she called a telephone number her mother had been given for Minch, and that the number was disconnected. No other attempt, legal or otherwise, was made to locate him. Moreover, it is not even clear that Minch's testimony would be helpful to Perry's case. Perry testified that Minch went to sleep on the couch in the living room after Perry and Fairbanks went into their bedroom. Unless Minch watched the bedroom door for the rest of the night, however, this testimony would not necessarily prove that Perry was not at the post office. The unavailability of this witness and his testimony therefore did not prejudice Perry.

Perry's efforts to locate the couch with the exposed spring were similarly perfunctory. Perry and Fairbanks moved out of the house near the post office shortly after May 23, 1984. Fairbanks testified that she and Perry tried to find the couch, apparently by contacting the landlord, when they received the letter informing Perry that he was still under investigation. She testified that they tried again three weeks prior to trial. According to the defense, the couch with its exposed spring would explain the scratches on the back of Perry's right leg. This, however, was the fourth explanation Perry offered for the origin of the scratches, and the court may justifiably have been skeptical about the necessity of the couch to Perry's defense. Fairbanks corroborated Perry's testimony about the couch and the scratches; the absence of the couch did not unduly prejudice the defense.

In short, Perry failed to demonstrate the high degree of prejudice necessary to overcome the court's deference to the government's prosecutorial decisions. The defendant, in the belief that the government bore the burden of showing a legitimate purpose for the delay, did not speculate as to what tactical advantage the United States may have gained by delaying prosecution. There is a longstanding conflict in this circuit as to whether the defendant or the government bears the burden of proving the purpose for the delay. *United States v. Jones*, 808 F.2d 561, 567 n. 4 (7th Cir.1986); *United States v. Brock*, 782 F.2d 1442, 1443 n. 1 (7th Cir.1986); *United States v. Williams*, 738 F.2d 172, 175 n. 1 (7th Cir.1984). Once again, however, we do not resolve the conflict because, as in *Williams*, the "appellant has not met his burden of showing actual and substantial prejudice to his defense, a threshold requirement under either line of cases." 738

F.2d at 175. Therefore, the government's delay in this simple case is neither explored nor condoned.

## B. Seizure of Defendant's Shoes

The defendant argues that his tennis shoes were seized in violation of the fourth amendment to the United States Constitution because the officers seized them without a warrant. The district court denied defendant's motion to suppress, finding that the government's seizure of the tennis shoes was pursuant to the "plain view" exception to the warrant requirement.

■ The plain view exception to the general requirement that police must have a warrant before they seize evidence was outlined in the Supreme Court's plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 464–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971), and reiterated in another plurality opinion in *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983). In order for a seizure to be lawful under the exception, (1) an officer must legitimately be in a position from which the item is in plain view, (2) the officer's discovery of the item must be inadvertent, and (3) the incriminating nature of the item must be immediately apparent to the officer. *Moya v. United States*, 761 F.2d 322, 326 (7th Cir.1984); *United States v. Reed*, 726 F.2d 339, 343 (7th Cir.1984); *United States v. McDonald*, 723 F.2d 1288, 1295 (7th Cir.1983), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Thomas*, 676 F.2d 239, 243–44 (7th Cir. 1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 364 (1981); *United States v. Schire*, 586 F.2d 15, 17–19 (7th Cir.1978).

■ The seizure of Perry's tennis shoes easily meets the requirements of the plain view exception. Inspector Cope was legitimately in a position to view Perry's shoes: Perry had consented to show Inspector Cope and the other officers where he had dumped his trash, and they were simply following Perry to the location when he stopped for gas and got out of his car.[2] Inspector Cope's discovery of the tread pattern on the soles of Perry's shoes occurred inadvertently when Perry bent down on one knee to pump gas into his car. And because Inspector Cope was still carrying pieces of the broken glass he had picked up inside the post office, it was immediately apparent to him that the tread pattern, which appeared to match that on the glass fragments, could link Perry to the break-in. Under the plain view doctrine, therefore, the officers were justified in seizing Perry's shoes.

## C. Exclusion of Defendant's Mother as a Witness

After the close of testimony, defense counsel made an offer of proof that Mrs. Perry, defendant's mother, could, if allowed, corroborate Perry's and Fairbanks's testimony about the couch with the exposed spring, and would testify that she herself had been scratched by the spring. Perry argues that the district court's exclusion of this witness's testimony was improper. We disagree.

Earlier, defense counsel had moved, pursuant to Federal Rule of Evidence 615, to exclude witnesses from the courtroom, and the district court had granted the motion. Because Mrs. Perry's name did not appear on the defendant's witness list, she was present in the courtroom and heard all of the testimony. Perry and Fairbanks both testified that the scratches on Perry's right leg were caused by the exposed spring.

■ The practice of excluding witnesses serves to prevent them from tailoring their testimony to that which has already been presented, and helps to detect testimony that is less than candid. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). At best, Mrs. Perry's testimony would have been

---

**2.** In general, police must have some prior justification for their access to an item that is in "plain view." However, "police may need no justification under the Fourth Amendment for their access to an item, such as when property is left in a public place." *Texas v. Brown*, 460 U.S. 730, 738 n. 4, 103 S.Ct. 1535, 1541 n. 4, 75 L.Ed.2d 502 (1983). In this case, Perry's tennis shoes were publicly displayed so that Inspector Cope needed no justification for viewing them.

merely cumulative. Because the dangers of allowing the testimony outweighed its possible usefulness to the jury, we find that the district court did not abuse its discretion in excluding the witness and her testimony.

For the reasons stated, the defendant's convictions are

AFFIRMED.