UNITED STATES of America, Plaintiff-Appellee,

v.

Glenn WELLMAN, Defendant-Appellant.

No. 86-2344.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1987.

Decided Oct. 2, 1987.

---

8. *See* IRCA, Pub.L. No. 99-603, § 101(a)(1), 100 Stat. 3341-3 to -36.

George P. Lynch, Chicago, Ill., for defendant-appellant.

James T. Zuba, AUSA (Anton Valukas—USA), Chicago, Ill., for plaintiff-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Defendant-appellant, Glenn Wellman, was convicted of two counts of mail fraud (18 U.S.C. § 1341 (1982)) relating to misrepresentations made regarding whether chemical tanks manufactured by his company complied with Department of Transportation and Coast Guard regulations. Wellman challenges his conviction on various grounds, contending that: (1) the delay in indicting him (just 1 day short of the 5-year statute of limitations) violated due process; (2) the trial court should have suppressed statements he claims he was "tricked" into making to the FBI and the United States Attorney; (3) the evidence was insufficient to support his conviction; (4) the trial court improperly limited his cross-examination of government witnesses, designed to detect supposed bias; (5) the trial court should have granted a continuance to allow him to produce the government's fingerprint expert to testify that a fingerprint analysis of certain documents in the case was negative for his fingerprints; (6) the government improperly attempted to prevent a witness from cooperating with him; (7) various evidentiary rulings of the trial court prejudiced him; and (8) the trial court's sentencing was improper. We find no error and therefore affirm.

I

The defendant, Glenn Wellman, was President and Chief Operating Officer of IWI Industries ("IWI") in Summit, Illinois. IWI had two subsidiaries, Itasco Products of Summit, Illinois, and Itasco of California (both referred to collectively as "Itasco" except where necessary to distinguish between the locations of the plants), that manufactured new portable shipping tanks and refurbished used tanks for use in the chemical industry.[1]

In 1978, M–Chem Chemical Company, a manufacturer of chemicals used in the petroleum industry, learned that Itasco had reconditioned portable shipping tanks available for sale at substantially less than the cost of new tanks. In response to an inquiry from M–Chem, Wellman sent a letter regarding the tanks. With the letter, he attached a "drawing on a limited quantity of portable shipping tanks designed to meet Coast Guard approval" and noted that the "tanks are used but in 'like new' condition, and ... we would ensure that these tanks would meet Coast Guard specifications by submitting them to our DOT[2] testing procedures." Gov't Ex. M–Chem 2. Enclosed with the letter and the drawing was an "exemption" in the name of Petrol-

---

**1.** The term "portable shipping tank" is something of a misnomer, since the tanks held 500 gallons or more of chemicals and weighed in excess of two tons when filled. However, the tanks were "portable" in the sense that they were designed to be used for shipment of chemicals and were typically loaded either onto flatbed trucks or barges for land or water transportation. A manufacturer or shipper of chemicals typically would ship its product in either portable shipping tanks, such as those involved in the instant case, or in 55 gallon drums.

**2.** The term "DOT" stands for the United States Department of Transportation, which, along with the Coast Guard, regulates the types of containers in which chemicals can be shipped.

ite Corporation.[3] The drawing attached by Wellman did not correspond to the Petrolite drawing upon which the exemption was based, although Wellman had the Petrolite drawing in his possession at the time the letter and exemption were sent. The tanks sent to M–Chem were constructed, with variations noted below, according to the drawing attached by Wellman rather than the Petrolite drawing. When M–Chem's vice-president called Wellman to ask about the fact that the exemption was in Petrolite's name, Wellman assured her that M–Chem could use the tanks under the exemption and that the next exemption would be issued in M–Chem's name. Additionally, he again assured her that the tanks complied with DOT Specification 57.[4]

After M–Chem was satisfied that the tanks could legally be used for its purposes, and after it had business contacts in California inspect and photograph some of the tanks, M–Chem decided to order some of the used tanks. The tanks were gener-ally ordered in lots of 10 (although sometimes more) and ranged from approximately $460 to $500 apiece in price. The first order was placed in late 1978 or early 1979. In mid–1979, however, Itasco ran out of the used tanks and told M–Chem that if it wanted additional tanks, it would have to order new tanks, manufactured by Itasco, which would cost slightly more. M–Chem did order some of the new tanks, at a cost of $786 each. M–Chem continued to order tanks throughout 1979.

In December of that year, however, M–Chem's president wrote Wellman to complain that many of the tanks in the most recent shipments did not comply with the parties' agreement or DOT specifications. Specifically, the tanks lacked fusible vent plugs and extended bottom drains with valve guards,[5] and many of them lacked DOT nameplates.[6] In addition to pointing out the defects, the letter noted that Wellman's apparent understanding that M–Chem had ordered 70 additional tanks,

3. The parties have ill-explained the function served by "exemptions," such as those involved in this case. At oral argument, Wellman's counsel represented to the court that tanks built to DOT Specification 60 could be used to ship chemicals such as those used by M–Chem over water without an exemption, but those built to DOT Specification 57 would require an exemption for such use. Although this would be a convenient way of viewing the exemptions, it appears to be a somewhat inaccurate oversimplification. Our review of the Petrolite exemption itself reveals that it "authorizes the shipment of flammable liquids in a marine portable tank where a DOT Specification 57 tank is permitted, and provides no relief from any regulation other than as specifically stated." Gov't Ex. M–Chem 3. The exemption also specifies that the covered tanks be "designed and built according to Title 46 CFR, Part 64; Division 1, Section VIII of the ASME Code, 1974 edition; and Petrolite Corporation Drawing No. 6403." *Id.* Thus, the exemption appears to authorize a tank to be used that does not completely comply with DOT Specification 57, although it complies with other regulations and a previously submitted drawing, in any case where the regulations call for a tank which does comply with DOT Specification 57.

4. In addition to meeting the DOT specifications, M–Chem apparently believed that the tanks were to be "Coast Guard Approved." Unlike the Department of Transportation, which apparently does not approve individual tanks but only approves the design of tanks based on drawings and a performance test of a prototype tank, the Coast Guard does inspect and approve individual tanks. When a tank is approved, the inspector applies a Coast Guard insignia (in the shape of a propeller) to the tank. It is unclear from the record whether Wellman ever represented that the tanks had been approved in this fashion or merely, as his letter stated, were "designed to meet" Coast Guard approval. Accordingly, this opinion will focus on Wellman's representations regarding compliance with DOT regulations and the exemptions.

5. A "fusible vent plug" is a pressure relief device which is designed to vent when the interior pressure of the tank reaches a certain level. The plug thus prevents vapor buildup within a tank which could lead to a rupture of the tank. The "extended bottom drain" was used to drain the tank when the chemicals reached their destination. "Valve guards" were necessary on the drains so that the drain valve would not be damaged in transit, leading either to leakage of the contents of the tank or an inability to drain the tank.

6. The nameplates include, among other things, the number of the tank, the manufacturer's certificate that the tank complies with DOT specifications, and the date the tank was last retested (a procedure involving filling the tank with air to test the pressure it would hold, whether there are leaks, and the pressure at which the tank would vent).

which were to be held for later shipment, was in error. After receiving the letter, Wellman sent the necessary parts. M–Chem withheld payment for the tanks until the defects were cured.

M–Chem continued to order additional tanks from Itasco, although there were occasional problems with the tanks. In one instance, for example, tanks were shipped without identifying numbers, which Wellman subsequently supplied by mailgram. Additionally, when replacement parts, particularly lids and closures, for the tanks were needed, M–Chem ordered them from Itasco, through Wellman.

In mid–1980, M–Chem discovered that it had more serious problems with the tanks when a customer refused to accept M–Chem products shipped in the tanks because the tanks did not comply with government regulations. Upon doing some checking, M–Chem realized that the Petrolite exemption had expired in 1978, before any tanks had even been ordered, and that a replacement exemption had never been sent. Accordingly, M–Chem's vice-president again called Wellman to have him remedy the problem. Wellman assured her that a replacement exemption indeed existed and that he would send it.

At this point M–Chem contacted the Coast Guard. Following this contact, M–Chem's vice-president again called Wellman and indicated that M–Chem needed a copy of the exemption in its office in order to ascertain whether the tanks would serve M–Chem's purposes. Again, Wellman said he would send the new exemption. Still, however, no exemption was received. Subsequent conversations took place between M–Chem's vice-president and Wellman in which, in addition to repeating that he would send the exemption, he assured her that the tanks were "Coast Guard approved DOT 57 tanks." Tr. 78. After these assurances, M–Chem ordered additional tanks, although the price had risen to $946.

Following this order, M–Chem again contacted Wellman regarding documentation that the tanks complied with government regulations. Following this contact, on February 5, 1981, Wellman sent M–Chem a letter (the "count mailing" for count 1 of the indictment) in which he "confirm[ed] that the tanks previously purchased and currently on hand by your company are constructed as per DOT 57 and DOT 60 specifications as requested by the Department of Transportation and the U.S. Coast Guard." Gov't Ex. M–Chem 16. Additionally, he wrote that:

> I am listing the approval numbers as requested and if there is additional information required, please contact me.

> Department of Transportation, Title 49 CFR Section 178.251, 178.253, 178.253–5B, Part 6450.25 1, 64.61, 64.63, 54.15–13 and E–8347–A.

*Id.*

Recognizing that many of the numbers Wellman characterized as "approval numbers" were merely citations to the governing DOT regulations (although the reference to "Part 6450" appears to have been a typographical error), and not understanding what "E–8347–A" referred to, M–Chem's vice-president called Wellman to tell him, again, that an exemption was needed, not citations to regulations. Wellman promised to send the exemption. After an erroneous mailing of retest certificates, which M–Chem again had to straighten out over the phone with Wellman, a purported exemption was sent along with a letter on March 11, 1981 (the letter erroneously bore the year 1982), which stated, in pertinent part:

> In followup to our recent telephone conversation, I am enclosing copies of our D.O.T. exemption E–8347–A which is self explanatory.

Gov't Ex. M–Chem 18a.[7]

This letter was the "count mailing" for count 2 of the indictment.

---

**7.** The purported exemption which accompanied the letter was in Itasco's rather than M–Chem's name. M–Chem nevertheless apparently accepted Wellman's assertion that it could use such an exemption. A DOT official testified at trial, however, that only entities which are formally "parties" to an exemption can use it to excuse full compliance with the regulations.

M–Chem continued to order tanks from Itasco, through Wellman, until informed by DOT and Coast Guard representatives that the tanks did not meet DOT Specification 57 and could not be used. The exemption sent by Wellman turned out to be bogus, and thus could not be used for shipment of the tanks. When M–Chem informed DOT and the Coast Guard that if required to cease all use of the tanks it would be put out of business, DOT representatives told M–Chem that it could write DOT to obtain an emergency exemption which would allow use of the tanks if certain steps were taken to ensure that the tanks could safely be used. Among other things, M–Chem was required under the terms of the emergency exemption to provide the tanks with fusible vent plugs and to pressure test the tanks. M–Chem took those steps and continued to use the tanks.

When Coast Guard and DOT representatives inspected the Itasco tanks on hand at the M–Chem facility, they concluded that none of the tanks on hand either met DOT Specification 57 or were approved by the Coast Guard. The primary noncompliance items related to closures and venting devices found on the covers to the tanks, although some were also "out of test," meaning that they had not been retested within the last two years, as required by government regulations, and some lacked DOT nameplates.

An indictment was filed on February 4, 1986, charging Wellman with two counts of mail fraud and one count of forgery. After trial, the district court dismissed the forgery count, holding that there was no evidence of intent to defraud the United States, an essential element. The propriety of that dismissal is not before us.

On the mail fraud counts, the government's theory of the case was that Wellman engaged in a scheme to defraud M–Chem of its right to have tanks which complied with government regulations, and that he furthered that scheme through the use of the United States Mail, in violation of 18 U.S.C. § 1341 (1982)[8], when he sent the February 5th and March 11th, 1981 letters to M–Chem.

Wellman's defense consisted of his contention that the tanks complied with DOT Specification 57 when sent to M–Chem and the resulting non-compliance resulted from lost or damaged covers or nameplates on the tank, which M–Chem was responsible for replacing. Additionally, he denied any knowledge that the exemption in Itasco's name was bogus, asserting that it had been obtained by personnel in the California office and sent to him, and that he merely forwarded the exemption to M–Chem with a cover letter.

After a three day trial, the jury returned a verdict of guilty on both counts of mail fraud. Wellman was sentenced to one year in the custody of the Attorney General on one of the counts and 5 years of probation on the other. In addition, he was ordered to pay a fine and to perform 2000 hours of community service work during his probation. In pre- and post-trial motions (and now in this court) Wellman raised the grounds outlined above, which he claimed entitled him either to dismissal of the indictment, a new trial, or a judgment of acquittal.

## II

■ We first consider Wellman's contention that the preindictment delay was violative of due process. The statute of limitations is the primary (although not exclusive) safeguard of the defendant's right to be indicted in a timely fashion. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 50 L.Ed.2d 752 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468

---

**8.** 18 U.S.C. § 1341 provides, in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or knowingly causes to be delivered by mail according to the direction thereon, ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

(1971)); *United States v. Watkins*, 709 F.2d 475 (7th Cir.1983); *United States v. Soloman*, 688 F.2d 1171, 1179 (7th Cir. 1982). In some limited circumstances, however, such delay, even though the indictment is filed within the statutory period, may amount to a violation of the defendant's right to a fair trial under the Due Process Clause. As the Supreme Court has succinctly put it, "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Lovasco*, 431 U.S. at 789, 97 S.Ct. at 2044. To make out such a claim, there must be: (1) prejudice to the defendant, and (2) an impermissible purpose for the delay. *See United States v. Perry*, 815 F.2d 1100, 1102–03 (7th Cir. 1987); *United States v. Jones*, 808 F.2d 561, 567 (7th Cir.1986); *United States v. Brock*, 782 F.2d 1442, 1443 & n. 1 (7th Cir.1986); *United States v. Brown*, 742 F.2d 359 (7th Cir.1984).

■ Wellman's allegations of prejudice are insufficient to support such a claim. He has alleged that the corporate records of the California entity were lost or destroyed when that entity was dissolved in 1983 [9] and that witnesses from that entity cannot be located. Thus, he claims he has lost the opportunity to show that the fraudulent exemption was prepared in California without his knowledge. However, he has not identified specific documents or witnesses which would aid his case; he has not made any showing of what the probable contents of the documents or what the testimony would show; and he has not made any showing of his efforts if any, to obtain the testimony or documents. Such showings are essential to his claim. *See Brown*, 742 F.2d at 362. Accordingly, we reject Wellman's contention that the pre-indictment delay violated Due Process.[10]

### III

We also reject Wellman's contention that the trial court should have suppressed statements that he made to the FBI, which he thought were given as part of a DOT civil investigation. He contended that the government misled him about the nature of the investigation and that it had a duty to inform him that he was under investigation by the grand jury. He contended that the admission of the statements, obtained through government deception, violated due process. Additionally, he claims that statements he made to an Assistant United States Attorney should have been suppressed because her use of a grand jury subpoena was "deceptive," that is, he was subpoenaed and as a result went to the Assistant United State's Attorney's Office, with his lawyer, and while there made incriminating statements in an interview. At the end of the interview, he was told that he need not appear before the Grand Jury.

■ We conclude that the magistrate and the district court were correct in declining to suppress the statements. The magistrate specifically found that the FBI agent who interviewed Wellman did nothing to affirmatively mislead him about the nature of the investigation. Wellman does not challenge this finding as "clearly erroneous," nor do we believe he could. The mere fact that Wellman thought that the agent was investigating a civil matter does not give rise to an obligation on the part of the government to inform the defendant that he was the subject of a criminal investigation. *See United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983). In *Serlin*, we held:

> To prevail on [a claim of government deception] defendant must produce clear and convincing evidence that the agents affirmatively mislead [sic] him as to the true nature of their investigation.... Simple failure to inform defendant that he was the subject of the investigation,

9. The reason for the destruction of the records of the corporation upon its dissolution is not apparent from the record. We note, however, that Wellman's position in the company should have enabled him to prevent this unfortunate circumstance.

10. Once again, we note, but need not resolve the longstanding conflict in this Circuit regarding whether the government or the defendant bears the burden of establishing the reasons for the delay once prejudice has been shown. *Perry*, 815 F.2d at 1104; *Jones*, 808 F.2d at 567 n. 4; *Brock*, 782 F.2d at 1443 n. 1.

or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agent's failure to respond was intended to mislead.

*Id.*

Wellman places particular emphasis on the fact that the Agent stated that he was there to investigate matters relating to the DOT. However, those representations were entirely accurate given the nature of the criminal investigation that was proceeding.

■ Also, even assuming that Wellman could establish a causal connection between the Assistant United States Attorney's use of the grand jury subpoena and the statements he made during the interview, we do not believe that the use of the subpoena was improper. At the time Wellman was subpoenaed, the government may well have thought his testimony necessary. When he produced the documents sought and made incriminating statements voluntarily at the interview, in the presence of his counsel, the need to call him before the grand jury may have been obviated.

### IV

We next consider whether the evidence was sufficient to establish fraudulent intent on Wellman's part. In evaluating this challenge, we note that an appellant who challenges the sufficiency of the evidence to sustain a jury verdict of conviction bears a heavy burden. *United States v. Fulk,* 816 F.2d 1202, 1206 (7th Cir.1987); *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987); *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983) (citing *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977), and *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)), *cert. denied,* 467 U.S.

1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). We review the evidence in the light most favorable to the government and must sustain the verdict if " '*any* rational trier of fact could have found guilt beyond a reasonable doubt.' " *United States v. Reynolds,* 801 F.2d 952, 954 (7th Cir.1986) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We conclude that while the evidence is not, as the government contends, "overwhelming," it is sufficient to sustain the convictions.

■ Conviction for a violation of 18 U.S.C. § 1341 requires two basic elements: (1) a scheme to defraud; and (2) use of the mails in furtherance of that scheme. *E.g., United States v. Shelton,* 669 F.2d 446, 454–55 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Here, the primary factual dispute was the existence of a scheme to defraud or, more particularly, intent to defraud on Wellman's part. Of course "schemes to defraud" come in many varieties. The mailings themselves need not be fraudulent. *United States v. Kwiat,* 817 F.2d 440, 443 (7th Cir.1986) (citing *United States v. Green,* 786 F.2d 247, 249 (7th Cir.1986) (collecting cases)). It is enough that the mails are used in the course of the scheme as an expected by-product of it. *Id.* [11]

While we by no means attempt to expound an all embracing definition of what constitutes such a scheme (for any such attempt would be futile), we find a definition articulated by the Third Circuit to be helpful in the case before us. The Third Circuit has stated that in determining whether a particular course of conduct constitutes a "scheme to defraud" within the meaning of the statute:

> ... there are no hard and fast rules of law to apply. The "scheme to defraud" element of the offense of mail fraud un-

---

11. Of course, the mailings must be "causally linked to the scheme's success." *United States v. Kwiat,* 817 F.2d 440, 443 (7th Cir.1986) (citing *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986)). However, the mailings in this case clearly satisfied the "causally linked" test, if only as "lulling letters."

*See Lane,* 106 S.Ct. at 733. Arguably, they were considerably more than "lulling letters," since M–Chem's vice-president testified that she would not have continued to deal with Wellman unless the tanks complied with government regulations and/or were exempt, conditions the letters assured her existed.

der § 1341 is not defined according to any technical standards.... The scheme need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions calculated to deceive persons of ordinary prudence and comprehension.

United States v. Pearlstein, 576 F.2d 531 (3d Cir.1978) (citing, inter alia, United States v. Serlin, 538 F.2d 737, 743–44 (7th Cir.1976)); cf. Serlin, 538 F.2d at 744 (Section 1341 "was intended to prohibit 'conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society' '") (quoting Blachly v. United States, 380 F.2d 665, 671 (5th Cir.1967) which in turn quoted Gregory v. United States, 253 F.2d 104, 109 (5th Cir.1958)).

We note that the Supreme Court recently rejected the notion that the mail fraud statute reaches schemes to deprive citizens of their "intangible rights" to honest performance of public duties by government officials. See McNally v. United States, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). However, that decision does not affect our disposition of this case because, in spite of the indictment's characterization of the scheme as one to defraud M–Chem of "its right to have safe and authorized equipment for the storage and shipment of hazardous chemicals and of its right to know that equipment it purchased was in full compliance with D.O.T. regulations," the substance of the charge was that Wellman facilitated the sale of the tanks by falsely representing that they were in compliance with the regulations.

The gist of McNally, as we read that case, is that the mail fraud statute was intended to reach only schemes to deprive innocent persons of their property rights. See id. at ——, 107 S.Ct. at 2878–80 (quoting legislative history and analyzing Congressional purpose). The defect in the convictions overturned in McNally was that the indictment charged and the jury instructions allowed conviction for conduct that was not an offense under the statute. Id. at ——, 107 S.Ct. at 2880–84; see also United States v. Gimbel, 830 F.2d 626–627

(7th Cir.1987) (convictions overturned in McNally and in Gimbel because jury was "not required to find that the scheme resulted in the government being deprived of money or property"). Thus, we must look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense.

Just exactly what constitutes an "intangible right" is not elucidated by the Court's opinion in McNally. It is clear only that it is one not involving "money or property" and that the "right of citizenry to good government" is one example. Justice Stevens, dissenting in McNally, opined that "intangible rights" would also include "fiduciary duties" violated "by accepting kickbacks or selling confidential information[,]" "rights to privacy, and other nonmonetary rights." —— U.S. at ——, 107 S.Ct. at 2883–84 (Stevens, J., dissenting); see also Gimbel, 830 F.2d at 626 (depriving Treasury Department of Currency Transaction Reports and of other "accurate and truthful information and data"). We believe these examples share a common thread. That is, they involve rights whose violation would ordinarily result in no concrete economic (or, to use Justice Stevens' term, "monetary") harm. A perusal of the indictment, jury instructions, and proof of this case leads to the ready conclusion that it simply does not fit the "intangible rights" mold.

■ There was but one scheme alleged in the indictment, and that scheme involved: (1) representing both orally and in writing that the tanks were "DOT approved" when Wellman knew that they were not; (2) sending M–Chem the Petrolite exemption with the representation that M–Chem could use it with the tanks when he knew that it pertained to different tanks and could not be used by M–Chem even if the tanks were the same; and (3) sending the bogus exemption, knowing it to be so. This scheme was intended to and did result in M–Chem's purchase of tanks from his

companies and was furthered by use of the mails. It is true that this scheme is conclusorily alleged to be a scheme and artifice to both "defraud M–Chem of its right to have safe and authorized equipment for the storage and shipment of hazardous chemicals" and to have "obtained money by means of false and fraudulent pretenses, representations and promises." But even assuming that these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical. The legal characterization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute. In sum, we believe that *McNally* prescribes more than a rule of pleading.

The charge to the jury permitted conviction if it found either a "scheme to defraud" or that Wellman obtained money through "false pretenses, representations and promises." Because the instruction merely tracks the statutory language, without more it is plainly a correct statement of law. What is crucial is that the "scheme to defraud" was not defined in such a way as to allow conviction for conduct which was not an offense. The jury instruction defining "scheme to defraud" was fully consistent with *McNally*. It provided, in pertinent part:

> A scheme means some plan or course of action having a common purpose, and intended to deceive another *and to deprive another of something of value* by means of false pretenses, representations or promises . . .

R. 39 (Gov't instruction 18), Tr. 442 (emphasis added).

Finally, the proof in this case removes any doubt regarding the nature of the scheme. Consistent with the theory of the indictment and the jury instructions, the proof at trial showed that Wellman fraudulently represented that the tanks complied with government regulations in order to effect their sale. The harm to M–Chem, i.e., the money it initially paid Wellman and the additional sums it was required to spend in order to continue to use the tanks, was anything but "intangible."

The intangible rights theory rejected in *McNally* covers conduct fundamentally different from that involved in this case. *McNally* dealt with "intangible rights" of the citizenry at large to honest government, while the present case plainly deals with, and *only* with, a fraudulent sale of tanks by deliberately and falsely representing that they complied with government regulations. Wellman's scheme clearly involved " 'wronging [M–Chem] in [its] property rights by dishonest methods or schemes.' " *See McNally,* —— U.S. at ——, 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). This is true whether one views the "property" involved as M–Chem's money, which Wellman obtained by selling tanks falsely represented to comply with government regulations, or the tanks themselves. Thus, far from involving "intangible rights," this case presents a typical "garden variety" fraud perpetrated against M–Chem, in part through the use of the United States mail. Such conduct was precisely what Congress intended to proscribe.

■ We believe that the jury had ample evidence to find the existence of a scheme to defraud within the meaning of the mail fraud statute. Wellman contended, and still contends, that the tanks complied with DOT Specification 57 when shipped to M–Chem, and that subsequent events, particularly the loss of tank covers and improper replacements, resulted in the non-compliance that was observed by DOT and Coast Guard representatives. However, M–Chem's vice-president testified that many of the tanks lacked necessary parts when received by M–Chem. Additionally, she testified that *all* replacement parts were ordered through Wellman. Finally, the DOT and Coast Guard representatives testified that none of the tanks inspected by them complied with Specification 57. These circumstances in the aggregate make Wellman's claim that M–Chem was to blame for the non-compliance of the tanks extremely unlikely—sufficiently unlikely,

we believe, that the jury was entitled to reject it even under the "reasonable doubt" burden of proof which the government had to carry.

Also, the government is correct that Wellman's letter, which referred to DOT regulations and the purported exemption number as "approval numbers," appears to have been deliberately drafted to mislead. A listing of published regulation sections was obviously not what M–Chem was asking for and the letter's characterization of those sections appears calculated to give the impression that they were something else.

Additionally, although Wellman is correct that the government did not directly tie him to the falsification of the Itasco exemption, by forensic evidence or otherwise, there were circumstances from which the jury could conclude that he was aware that the exemption was not genuine, even if he personally was not responsible for the forgery (although, as we have noted above, the mailing itself need not have been fraudulent to support the conviction). First, he had referred specifically to the exemption, in one instance by number, on numerous occasions prior to sending it to M–Chem. Second, although he denied having seen the exemption, he signed a cover letter which accompanied the exemption and noted that it was "self-explanatory." Third, after being continually evasive in the face of M–Chem's repeated requests for an exemption, he suddenly produced one when it became apparent that was the only way to retain M–Chem's business. Fourth, he had earlier sent M–Chem an exemption which clearly could not authorize M–Chem's use of the tanks (the Petrolite exemption) and then assured M–Chem that its use of the tanks under that exemption was "perfectly legal."

 Regarding this last point, he also sent M–Chem a drawing (and, ultimately, tanks constructed in accordance with that drawing) that differed in material ways from the drawing for the tanks covered by the Petrolite exemption, although he had the Petrolite drawings in his possession. Although this fact, which arguably consti-

tuted a separate crime, may not be considered as merely establishing Wellman's bad character (i.e. we may not conclude that the fact Wellman committed previous crimes makes it more likely he was guilty of those charged in the indictment), it may be considered for other purposes such as its relevance to his intent or the absence of mistake. *See* Fed.R.Evid. 404(b). Additionally, the evidence, although it related to acts which took place outside the statutory limitations period, was highly relevant to the existence of the very same scheme to defraud which the mailings in this case were alleged to have furthered. The fact that the scheme, and acts committed in furtherance of it, may have extended over a period in part barred by the statute of limitations does not mean that they are irrelevant in determining whether mailings occurring within the statutory period were in furtherance of a scheme to defraud and thus proscribed by 18 U.S.C. § 1341. *United States v. Read,* 658 F.2d 1225, 1240 (7th Cir.1981); *United States v. Ashdown,* 509 F.2d 793, 798 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *United States v. Andreas,* 458 F.2d 491, 491 (8th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972).

From these facts, specifically the noncompliance of the tanks as received by M–Chem, the prior use of an exemption that could not have been sufficient for M–Chem's purposes with tanks that were not the same as those covered by the exemption, Wellman's misleading characterization of regulation sections as "approval numbers," and his continuing evasiveness in the face of M–Chem's requests, we believe that a rational jury could conclude that Wellman had devised a scheme to defraud M–Chem. The fact of the mailings (and their use to further the scheme) is not seriously in dispute. Therefore, we hold that the evidence was sufficient to sustain the convictions.

### V

 We next turn to the contention that the trial court violated Wellman's Sixth Amendment right to confront the witnesses against him by limiting Wellman's cross-ex-

amination of the government witnesses from M–Chem. Specifically Wellman contends that his counsel should have been allowed to ask Douglas Smith, the DOT investigator, whether he had assured M–Chem that it would not be prosecuted. We conclude that, under the circumstances of this case, no reversible error occurred when the trial court sustained the government's objection to this line of questioning.

■ A trial court has wide discretion to limit cross-examination. *United States v. Hinton*, 683 F.2d 195, 200 (7th Cir.1982), *affirmed on other grounds sub nom. Dixson v. United States*, 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984). This discretion continues to exist even though the questioning so limited is designed to elicit evidence of witness bias pursuant to the defendant's confrontation clause rights. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). In evaluating limitations on cross-examination designed to elicit this type of testimony, we must determine whether "the jury had sufficient information to make a discriminating appraisal of the witness's bias or motive." *Hinton*, 683 F.2d at 200 (citing *United States v. Fitzgerald*, 579 F.2d 1014 (7th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 611, 58 L.Ed.2d 677 (1978)). We conclude that the jury did have such information and therefore decline to hold that the trial judge abused his discretion in excluding the question.[12]

Throughout the trial, Wellman's counsel repeatedly elicited evidence designed to show the jury that the noncompliance of the tanks was M–Chem's fault. Immediately prior to the complained of exclusion, Wellman's counsel elicited the following information from Government Witness Smith:

12. In rejecting this contention, we do not rely on the government's argument that any promise not to prosecute was "irrelevant" because the witnesses had "done no wrong." Such a contention, it seems to us, rings hollow and could frequently be made by the government. It is more properly a matter for rehabilitation of an impeached witness, rather than a reason to refuse impeachment. Additionally, the government's explanation of why those two witnesses

Q. . . . Now, when you had this little interview with Ms. Chatelain and Mr. Vile [M–Chem's vice-president and another employee responsible for shipment of chemicals] at the time that you were doing your inspection—was that July 16, 1981?

A. July 15, 1981.

Q. 15th, was it?

A. Yes, sir.

Q. When you had this little interview with her, you told her that she wasn't under investigation, didn't you?

A. Yes, sir, I did.

Q. And you told her that M–Chem wasn't under investigation is that correct?

A. That's correct.

Q. And yet, your investigation showed that they were in violation of the Federal Regulations?

A. No, it did not.

Q. Oh. In other words, it was not their responsibility to have the tanks retested?

A. Yes, sir.

Q. Were they in violation—sir, were they in violation of the Federal Regulations?

A. There was no proof that the tank was shipped while it was out of test. If it's sitting there empty, there is no violation.

Tr. 303–04.

While Wellman's counsel was not allowed to complete the sequence by asking whether Smith had "assured Ms. Chatelain that in truth and in fact she would not be prosecuted," he had already exposed sufficient facts to enable the jury to evaluate the claim of bias. Additionally, in his cross-examination of Government Witness Barlow, Wellman's counsel had already elicited the following:

"had done no wrong" (the fact that an empty, non-conforming tank was on their premises was no proof that it had been shipped) is lame, at best. However, we do note that the government is correct that witness Smith did not have any authority to grant immunity, thus any promises from him to that effect (and the fact that he had no authority makes such promises unlikely) could properly be viewed as irrelevant.

Q. And once these tanks leave my client's premises, its up to the shipper, is it not, to retest them every two years?

A. Yes, sir.

Q. And the shipper in this case was M–Chem, right?

A. Yes, sir.

Q. Now, did M–Chem retest these tanks every two years, required by the regulations?

[Objection Sustained]

Q. Were any charges brought against M–Chem as a result of the investigation?

A. To my knowledge, no, sir.

Tr. 238–39.

Finally, Wellman's counsel drew the inference of bias for the jury in his closing argument:

> And then a dark day came. Investigators, as is the duty, of the Department of Transportation went to Lady Chatelain, and she was a bit nervous because she came to realize that she was supposed to have retested these tanks that she shipped hazardous, flammable, combustible materials in every two years so that the safety of the people of this great nation could be assured. And she had not fulfilled her obligations under the Department of Transportation regulations even though, as we later learned, those regulations received wide circulation, and there are all kinds of services available which people can obtain and read so that they may understand and carry out their obligations.
>
> But Lady Chatelain had not done that. No, indeed. She chatted with the Government investigators and tried to put the blame somewhere else. She tried to blame Wellman. She said, "He didn't give me the right piece of paper."

Tr. 416–17.

Thus, we conclude that through both evidence and argument, Wellman had a constitutionally sufficient opportunity to present his theory of witness bias to the jury. The district court was within its discretion to limit the cross-examination.

## VI

Wellman also contends the district court improperly refused to grant a continuance so that Wellman could present an expert to testify that the fingerprint analysis undertaken by the government did not yield any evidence that Wellman had handled the critical documents in the case. We disagree. Again our standard of review regarding rulings of this type is whether the trial judge's ruling was an "abuse of discretion." *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Dillon v. Duckworth*, 751 F.2d 895, 898 (7th Cir. 1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985); *United States v. Aviles*, 623 F.2d 1192, 1196 (7th Cir. 1980); *United States v. Berkwitt*, 619 F.2d 649, 659 (7th Cir.1980). Given our limited review of the question, we conclude that the trial court did not abuse its discretion.

First, our review of the record reveals that the Assistant United States Attorney asserted before the trial court, as it was considering Wellman's motion for a continuance, that the results of one fingerprint analysis had been provided Wellman's counsel in advance of trial, that a second set of exemplars (to be compared with as yet unidentified palm prints that the first analysis discovered on the documents) had been ordered by the trial court, and that it is the results of this second analysis that Wellman's counsel did not learn until the first day of trial. Tr. 384–86. Wellman's counsel did not dispute this assertion before the trial court, and, absent any contrary indication, we assume it to have been truthful. Thus, Wellman's counsel knew in advance of trial that fingerprint analysis of the relevant documents had failed to yield the defendant's fingerprints.

Secondly, the results of even this second analysis, again negative with regard to the defendant, were disclosed to his counsel on the first day of trial. The defendant should have moved immediately for a continuance or sought production of the report. His failure to do either until the close of the evidence, when the case was ready for submission to the jury, does not afford a basis for reversing the trial

court.[13] The trial court's succinctly stated decision not "to delay the trial for that" was, under the circumstances, eminently reasonable.

Finally, when Wellman's counsel was told that he could argue the absence of fingerprint evidence in his closing, he acceded to the trial court's denial of his motion for a continuance, effectively waiving the issue. The trial court stated in denying the motion for a continuance: "Obviously you can argue that the government—and I assume you will—that the government has not produced any fingerprint evidence." Wellman's counsel replied, "That's fair enough." Tr. 386. In this court, Wellman's counsel claims that he was "double-crossed" when the trial court sustained the government's objection to his argument. We do not accept this characterization. The trial court's statement in denying the continuance obviously contemplated that Wellman's counsel could argue that the government failed to produce *any* fingerprint evidence, not that *specific* fingerprint tests had been performed and had come up negative. Counsel's closing argument, on the other hand, was the following:

> It came to pass before the jury that the Government did not put in any evidence with respect to the results of the fingerprint analysis and the typewriting analysis which the experts and the FBI had conducted of the defendant.
> MS. SMITH [ASSISTANT UNITED STATES ATTORNEY]: Objection your Honor.
> THE COURT: The objection is sustained.
> MS. SMITH: I move for the jury to disregard that remark.
> THE COURT: Proceed with your argument.

Tr. 422.

We believe this argument was clearly beyond anything previously authorized by the district court. Thus we reject the contention that Wellman's counsel was "stabbed in the back."

## VII

Wellman also contends that the government improperly interfered with his access to important witnesses. We do not believe that the government's actions, while arguably improper, warrant reversal in this case. Wellman's showing on this point consisted of a three page handwritten "statement" by Fred Poulos, the defendant's son and manager of the California facility. Although the statement bears the purported signature of Poulos and two witnesses, it is neither notarized nor affirmed "under penalty of perjury," *see* 28 U.S.C. § 1746 (1982) (declaration under penalty of perjury generally may be used in lieu of oath sworn before notary public). Casting aside the evidentiary problems with the statement, it is not sufficient to establish prosecutorial misconduct which would warrant reversal.

According to the statement, an Assistant United States Attorney asked Poulos to wear a listening device when he spoke to Wellman (or to speak to him over the phone with the conversation being recorded). Additionally, she advised Poulos not to speak with Wellman or his lawyer without a bugging device. She indicated to Poulos that Wellman had said that he, Poulos, was responsible for the wrongdoing that took place. The potentially most damaging allegations made in the statement were:

> She said it is not advisable to speak with Wellman or his lawyer because it could be detrimental to me.
>
> \* \* \* \* \* \*
>
> She said that by disclosing any part of the case, is setting up defense for Wellman, and that makes me a spy and that

---

**13.** However, we find very disturbing the government's refusal to stipulate to the results of the fingerprint analysis, about which there appears to have been no genuine dispute. While we have no doubt that the Assistant United States Attorney was correct that "people touch documents and they don't leave fingerprints," the better course would have been to argue that point to the jury, which then would have had before it, for whatever it was worth, the fact that the defendant's fingerprints were not on the relevant documents. However distasteful we may find the government's trial tactics in this case, we do not believe that they were sufficiently egregious to warrant reversal of the defendant's conviction.

points the finger of guilt to me. At the trial, when my father tells the Court, I am responsible, and I spoke to the attorney and my father it makes my father's case against me better, because Ms. Smith said he's going to put the blame on me at trial.

R. 50 (attachment) at pp. 1, 3.

■ It is true that the quoted passages could be read as a veiled threat that the government would go after Poulos if he cooperated with Wellman, and so viewed might present a serious ethical question and possibly a question of constitutional dimension. *See United States v. Opager,* 589 F.2d 799 (5th Cir.1979), *appeal after remand,* 616 F.2d 231 (5th Cir.1980). However, such a construction is not warranted. It is entirely reasonable to consider the statements made by the Assistant United States Attorney as no more than gratuitous advice, designed to prevent Poulos from being tricked into a compromising position by Wellman or his counsel.

More importantly for our inquiry, though, is that there is no showing in the record that, whatever the intent of the remarks (or Poulos understanding of them), they had any impact. Wellman did not allege that his counsel had attempted to contact Poulos and had been rebuffed on the basis of the Assistant United States Attorney's remarks. Nor did he allege an attempt to secure Poulos' trial testimony through compulsory process. Indeed, the very fact that Poulos was willing to make the statement submitted by Wellman tends to indicate that he was undeterred from cooperating with Wellman. Under these circumstances, we do not believe that the statement can serve as a basis for reversing the conviction.

### VIII

Finally, Wellman challenges numerous evidentiary rulings by the trial court and information relied upon by the trial court at the sentencing hearing. Specifically, he contends that: (1) the trial court erred in admitting evidence that the tanks did not comply with DOT Specification 60, a specification he claims was irrelevant to the case; (2) the trial court erred by admitting evidence of Wellman's financial circumstances, in particular that at the time of the tank sales he owed a judgment of $148,000 to the United States; (3) the court improperly excluded evidence of the fair market value of the tanks; and (4) the sentencing procedure was improper because the trial court relied on what Wellman characterizes as "hearsay" reports of the Metropolitan Sanitary District regarding prior pollution problems at Wellman's Illinois facility and it considered documents submitted "ex parte." We reject these contentions as either legally without merit or, in some cases, without support in the record.

■ First, Wellman's letter to M–Chem asserted that the tanks had been constructed in accordance with "D.O.T. 57 *and* D.O.T. 60 specifications as requested by the Department of Transportation and the U.S. Coast Guard." Gov't Ex. M–Chem 16 (emphasis added). Thus, allowing testimony of the latter of those specifications was clearly not error.

■ Second, it was the government's theory that Wellman's financial circumstances were so desperate that he cut corners in producing and testing the tanks and he would make any representation necessary to retain M–Chem's business. The trial court specifically noted that the evidence was relevant to the defendant's motive. Tr. 382. A trial court has broad discretion in determining the relevance of evidence. *United States v. Green,* 735 F.2d 1018, 1026 (7th Cir.1984) (quoting *United States v. Sweeney,* 688 F.2d 1131, 1144 (7th Cir.1982)); *see also Trans-Car Purchasing, Inc. v. Summit Fidelity and Surety Co.,* 454 F.2d 788, 792 (7th Cir. 1971). We cannot say that discretion was abused.

■ Third, the issue in the case was whether Wellman made false representations and committed other fraudulent acts in order to sell the tanks, not the value of the tanks (nor, as Wellman repeatedly stressed at trial and in his brief in this court, the fact that the tanks "performed well in the field") even though they were

not as represented. Thus, the testimony was only marginally relevant. In any event, Wellman had already presented testimony that new tanks comparable to the used tanks he sold M–Chem were selling in the Louisiana area (where M–Chem did business) for up to $2600, but he sold his used tanks for only $400 and his new tanks for $900. Thus, the proffered evidence would have been cumulative. We find no error in the exclusion of this testimony.

 Finally, we note that a trial court is not precluded from considering hearsay at a sentencing hearing. *United States v. Cusenza,* 749 F.2d 473, 478 (7th Cir.1984). Assuming, without deciding, that the Metropolitan Sanitary District reports were hearsay that would ordinarily have been inadmissible at a trial (they may well have qualified as an exception to the hearsay rule as either business records or official records), Wellman had a full opportunity to contest their accuracy at the sentencing hearing, and his counsel vigorously cross-examined the government witness who testified about them.

In addition, the supposed problem with "ex parte" communications to the trial judge (apparently Wellman's counsel did not receive the government exhibits used at the sentencing hearing until the night before the hearing, although the Assistant United States Attorney asserted that she had served them in a timely fashion) was cured when the trial court granted Wellman's counsel's motion for a continuance to respond to those documents. Finally, the trial court's remarks in imposing the sentence in this case make it clear that he primarily considered the fact that Wellman " 'has continued to deny his knowledge of the instant offense and minimize the seriousness of it. He conveys an attitude of 'It was all a big mistake and no one got hurt, so why all the bother' he has not demonstrated a vestige of remorse, which is consistent with his attitude of denial.' " Tr. (Sentencing Hearing) 117 (quoting from the presentence report).

Wellman's primary complaint is that he was a first offender and therefore the court should have not imposed a sentence of incarceration. However, as long as the district court imposed a sentence within statutory limits and did not consider improper factors, we are not at liberty to disturb his sentence.

## IX

For the reasons stated above the convictions and sentences are

AFFIRMED.