UNITED STATES of America, Plaintiff,

v.

**Richard GINSBURG, Defendant.**

No. 82 CR 619.

United States District Court,
N.D. Illinois, E.D.

Jan. 10, 1989.

Supplemental Opinion Jan. 23, 1989.

Second Supplemental Opinion
Feb. 2, 1989.

Jeffrey B. Steinback, Benson, Steinback & Gillespie, Chicago, Ill., for plaintiff.

James R. Fleissner, Asst. U.S. Atty., Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In early 1984 Richard Ginsburg ("Ginsburg") was convicted of 19 counts of mail fraud under 18 U.S.C. § 1341 ("Section 1341") and one count of racketeering under 18 U.S.C. § 1962(c) ("RICO"), all stemming from Ginsburg's payments to fix cases during the course of his law practice before the Cook County Board of Appeals ("Board"). Ginsburg has joined the spate of defendants prompted by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) to seek retroactive relief: He has filed this 28 U.S.C. § 2255 ("Section 2255") habeas corpus petition to obtain an order vacating his convictions. For the reasons stated in this memorandum opinion and order, his petition is granted.

### *Background*

Ginsburg's convictions flow from a scheme, beginning in 1975, in which he and his then law partner Theodore Schmidt made cash payments to Board employees to obtain reductions in real estate tax assessments on properties owned by the law

firm's clients. Ginsburg was found guilty on all counts after a joint trial before a jury, and on April 26, 1984 this Court dealt with his sentence in these terms:

1. Imposition of sentence was suspended on all counts, and he was placed on concurrent probation for a five-year period.

2. In addition to his required compliance with all the regular terms and conditions of probation, he was ordered:

(a) to make restitution in the amount of $150,000; and

(b) to perform 1,000 hours of community service.

3. On the RICO count he was ordered to forfeit his $225,000 half interest in the firm's tainted legal fees, with the restitution payments to be credited against that forfeiture.

Ginsburg took an appeal, in which he challenged only the forfeiture order. After an initial reversal in an unpublished opinion, our Court of Appeals ultimately affirmed this Court in an en banc decision (*United States v. Ginsburg*, 773 F.2d 798 (7th Cir.1985)).

Ginsburg has completed his community service, has paid the full $150,000 in restitution and has begun to pay the balance due on his forfeiture. His probation runs through April 26, 1989.

By now every defendant of any vintage convicted under the so-called "intangible rights" theory of mail fraud[1] is aware that *McNally* has construed Section 1341 to require that the fraud must have been intended to deprive the victim or victims of money or property. Our Court of Appeals has

most recently described its post-*McNally* efforts in these terms (*United States v. Folak*, 865 F.2d 110, 113 (7th Cir. Dec. 19, 1988) (emphasis in original, citations omitted except for cases referred to later in this opinion)):

We have expressly held that *McNally* applies retroactively on collateral attack of a conviction. *Magnuson v. United States*, 861 F.2d 166, 167–68 (7th Cir. 1988) .... Although we have set aside a number of defendants' mail fraud convictions where they had been indicted for scheming to defraud victims *solely* of some intangible right, *see Magnuson, supra;* ... *United States v. Holzer*, 840 F.2d 1343 (7th Cir.), *cert. denied*, [—— U.S. ——], 108 S.Ct. 2022 [100 L.Ed.2d 608] (1988) (*"Holzer II"*), the presence of some language referring to an intangible rights theory is not always fatal to the indictment. For example, where an indictment alleges multiple schemes, some of which serve to defraud victims of property and others that deprive them of some intangible right, we have treated as surplusage any intangible rights theory of fraud that was "easily separable" from allegations of a scheme to defraud of money or property.... We have also held that where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right, *McNally* does not require setting aside the conviction.... *United States v. Wellman*, 830 F.2d 1453, 1462–63 (7th Cir.1987). In each of the above cases, we have looked beyond the language used to characterize the scheme in the indict-

---

**1.** This Court's opinion in *United States v. Gill*, 673 F.Supp. 275, 281 n. 8 (N.D.Ill.1987) briefly pointed out the misleading nature of the "intangible rights" label when used to identify impermissible mail fraud convictions, as defined by *McNally*, in contrast to mail fraud involving "money or property" in the Section 1341 sense. That potential misreading of *McNally* was addressed (and hopefully scotched) by the Supreme Court's next look at the issue in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987):

*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

Even so, as long as the "intangible rights" term is employed with constant awareness of its shortcomings, it can be a useful shorthand phrase. This opinion will consequently employ "intangible rights" (with the quotation marks as a continuing reminder of its imprecision, but without using "so-called" or any other added warning signal) from here on out to connote a mail fraud charge involving solely a deprivation of the right to honest government or a like evanescent concept lacking a money-or-property consequence (or as *Carpenter, id.* put it, "an interest too ethereal in itself to fall within the protection of the mail fraud statute").

ment, to the underlying substance of the indictment, in order that we might determine if it ultimately alleges a scheme involving money or property. Under *McNally*, an indictment alleges a violation of the mail fraud statute if it charges a defendant with conduct that would normally result in some kind of "concrete economic harm." *Wellman*, 830 F.2d at 1462.

Ginsburg now says his conviction was improperly obtained under the old "intangible rights" theory rather than in accordance with *McNally*.

### Section 2255 Analysis

■ Section 2255 allows a federally-convicted prisoner who is "in custody" to attack his conviction collaterally. Ginsburg satisfies the "in custody" requirement because "he is under the legal restraints imposed by probation" (*Gill*, 673 F.Supp. at 277 and cases cited therein). Government Mem. 2 concedes that.

*United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982) teaches the normal standard of review of a Section 2255 motion "is the 'cause and actual prejudice' standard enunciated in *Davis v. United States*, 411 U.S. 233, [93 S.Ct. 1577, 36 L.Ed.2d 216] (1973), and later confirmed and extended in *Francis v. Henderson*, 425 U.S. 536, [96 S.Ct. 1708, 48 L.Ed.2d 149] (1976), and *Wainwright v. Sykes*, 433 U.S. 72, [97 S.Ct. 2497, 53 L.Ed. 2d 594] (1977)." Although the post-*McNally* decisions in our Court of Appeals have not expressly addressed this issue as to pre-*McNally* "intangible rights" convictions, under *Frady*, *id.* 456 U.S. at 168, 102 S.Ct. at 1594 any defendant challenging a conviction on an objection not raised in the district court must show "both 'cause' excusing his double procedural default, and

'actual prejudice' resulting from the errors of which he complains."

#### 1. Cause

■ Ginsburg Mem. 1—3[2] says he did object to the indictment's "intangible rights" theory. Ginsburg's motion to dismiss the indictment argued (Government Mem. Ex. A, at 12) (footnotes omitted):

> Moreover, the theory must be rejected because it seeks further to expand liability under the mail fraud statute without any evidence of supporting legislative intent. The "intangible rights" theory already is the subject of severe criticism because of its present overly broad application. The present indictment represents but another step in this over-expansion.

Government Mem. 3 says:

> The defendant noted the scholarly criticism of the intangible rights doctrine, but did not urge the Court to dismiss the mail fraud counts on this basis.

Whether or not that handling by Ginsburg's able counsel amounts to having preserved the issue before this Court as a procedural matter, Ginsburg Mem. 2—6 admits he did *not* raise the issue on appeal. In *Frady* terms that is clearly a procedural default requiring Ginsburg to show "cause."

Ginsburg Mem. 2—6 to 7 then asserts he satisfies the "cause" requirement as expounded in *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). That contention poses a difficult question—one that fortunately need not be resolved for current purposes.

*Reed* dealt at some length with the relationship between the "cause" requirement and the "novelty" of the constitutional issue that counsel had failed to raise in the underlying proceedings.[3] Justice Brennan,

---

**2.** Because Ginsburg filed three memoranda in support of his motion, all references to those memoranda will (as in the text) identify which of them is involved (the number before the dash) as well as the page cited or quoted (the number after the dash).

**3.** Though *Reed* spoke in the context of a 28 U.S.C. § 2254 ("Section 2254") motion, the stan-

dards are the same under Sections 2254 and 2255 (cf. *Kaufman v. United States*, 394 U.S. 217, 226–27, 89 S.Ct. 1068, 1074, 22 L.Ed.2d 227 (1969)). Furthermore, courts have consistently applied *Reed* to Section 2255 cases, though without discussing the issue (see, e.g., *Dalton v. United States*, 862 F.2d 1307, 1310 (8th Cir. 1988); *United States v. Shelton*, 848 F.2d 1485, 1490 (10th Cir.1988) (en banc); *Moore v. United*

writing for the Court, began by noting (468 U.S. at 13, 104 S.Ct. at 2909) (citations omitted):

> Because of the broad range of potential reasons for an attorney's failure to comply with a procedural rule, and the virtually limitless array of contexts in which a procedural default can occur, this Court has not given the term "cause" precise content.... Nor do we attempt to do so here. Underlying the concept of cause, however, is at least the dual notion that, absent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel, ... and that defense counsel may not flout state procedures and then turn around and seek refuge in federal court from the consequences of such conduct.

Next Justice Brennan turned to the contrasting situation in which no intentional strategic decision can be inferred: counsel's failure "to raise a constitutional issue reasonably unknown to him" (*id.* at 14, 104 S.Ct. at 2909) because of its novelty (*id.* at 15–16, 104 S.Ct. at 2909–10). That led to the basic principle for which *Ross* is now recognized (*id.* at 16, 104 S.Ct. at 2910):

> Accordingly, we hold that where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.

Then, drawing upon *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), *Reed, id.* 468 U.S. at 17, 104 S.Ct. at 2910 (citations omitted) fleshed out the concept of "novelty" in terms of "three situations in which a 'new' constitutional rule, representing a 'clear break from the past,' might emerge from this Court":

> First, a decision of this Court may explicitly overrule one of our precedents.... Second, a decision may "overtur[n] a longstanding and widespread practice to which this Court has not spoken, but

which a near-unanimous body of lower court authority has expressly approved." ... And, finally, a decision may "disapprov[e] a practice this Court arguably has sanctioned in prior cases." ... By definition, when a case falling into one of the first two categories is given retroactive application, there will almost certainly have been no reasonable basis upon which an attorney previously could have urged a state court to adopt the position that this Court has ultimately adopted. Consequently, the failure of a defendant's attorney to have pressed such a claim before a state court is sufficiently excusable to satisfy the cause requirement.

That analysis should logically translate with equal force into a situation in which (1) the underlying conviction was obtained in a federal rather than a state court and (2) the new rule of law involves statutory rather than constitutional interpretation. With those changes, Ginsburg seeks to qualify under the second of *Reed's* three "novel" situations. One part of that qualification is indisputable: *Magnuson,* 861 F.2d at 167 has now expressly held *McNally* is to be applied retroactively in a collateral attack on a conviction. And as for the other *Reed* requirement, at the time Ginsburg was convicted the "intangible rights" doctrine was widely approved by the lower courts. It was consistently reaffirmed by our own Court of Appeals, where it had originally been announced (see, e.g., *United States v. Holzer,* 816 F.2d 304, 309–10 (7th Cir.1987) ("*Holzer I*")), and about half the other Courts of Appeals had also upheld and applied the doctrine (see cases listed in Justice Stevens' dissent in *McNally,* 107 S.Ct. at 2883 n. 1).

■ Despite that, this Court held in *Gill* (an early post-*McNally* decision) that a defendant in a legal position comparable to Ginsburg's did *not* satisfy the first ("cause") branch of the *Frady* analysis.[4]

---

*States,* 1988 U.S. Dist. LEXIS 345, at 2 (N.D.Ill.) [1988 WL 5020]).

**4.** That conclusion was an alternative (and therefore nonessential) ground for the *Gill* decision.

What was controlling there was the absence of legal "prejudice" to Gill, given the nature of what the jury must necessarily have found to convict him (673 F.Supp. at 281). In that respect, *Gill*'s denial of the Section 2255 petition

This Court's reasoning drew heavily not only on *Reed* but on how *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) had read and applied *Reed.* As *Gill,* 673 F.Supp. at 280 said of the defendant in that case:

> He must rely on the idea that at the time of his conviction three years ago the idea that there could not be an intangible-rights fraud prosecution under Section 1341 was a "claim ... so novel that its legal basis [was] not reasonably available to counsel ..." (*Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984)). For that purpose *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986) teaches "the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all." No claim can be said to be "unavailable" in that sense where that claim had previously been made in the lower courts (*id.* 106 S.Ct. at 2667–68).

This opinion will not repeat this Court's further analysis in *Gill, id.* at 280–81, which it continues to find persuasive—though this Court also continues to recognize "there might perhaps be room for difference of opinion on that score" (*id.* at 281). Indeed, since *Gill* the only two Courts of Appeals to have considered the issue have ruled otherwise, finding that defendants who had not disputed their "intangible rights" convictions before *McNally* did have "cause" under the *Reed* analysis for not having done so (*Dalton,* 862 F.2d at 1310; *Shelton,* 848 F.2d at 1490). Yet surprisingly neither of those courts even mentioned the post-*Reed* decision in *Smith,* although it seems plain to this Court that *Smith* must be recognized as at least equally definitive and as providing a limiting definition of what claims are "novel" and "unavailable" for purposes of ana-

lyzing whether a defendant had "cause" for not having asserted such claims.

On the issue of "cause" Ginsburg stands in a particularly vulnerable position. There is no question his counsel were well aware of the arguments against "intangible rights" mail fraud prosecutions—they asserted them before this Court. That hardly bespeaks "novelty" in the *Reed–Smith* sense. Nor is this a situation in which Ginsburg's able counsel would have had to take a bootless appeal just to preserve the "intangible rights" issue for the future contingency that *McNally* ultimately converted to reality. Counsel in fact *took* an appeal on Ginsberg's behalf, raising an issue (RICO forfeiture) that was not only a difficult one but was potentially "certworthy."[5] What that means is that counsel's raising of the "intangible rights" issue before the Court of Appeals (where Ginsburg was anyway) would have been entirely cost-free—and, though this is not necessary to the analysis, it would have been equally cost-free to raise the issue even before the Supreme Court if certiorari had been sought on the forfeiture question.

About the only answer this Court can conceive of is that Ginsburg's lawyers might have perceived that adding to their appellate brief an issue such as an attack on the "intangible rights" conviction (an issue on which our Court of Appeals had previously spoken several times) would be potentially dilutive of the force of the forfeiture argument. Everyone who has practiced before the appellate courts knows it is best to go with your strongest arguments, even if that means giving up others (whether simply to avoid clutter or to prevent your solid arguments from being tainted by contentions that the appellate court would be expected to dismiss out of hand).

But that is the classic example of lawyer strategy,[6] which *Reed* itself rejected as

---

anticipated several of the opinions (such as *Folak* and *Wellman*) that have since emanated from our Court of Appeals.

**5.** It will be recalled that Ginsburg's forfeiture argument originally prevailed in the Court of Appeals. It took an en banc reversal of the original panel (773 F.2d 798), with two separate

concurrences (*id.* at 803) and a two-judge dissent (*id.* at 804), to defeat Ginsburg.

**6.** It may be noted that well after Ginsburg's appeal another highly reputable lawyer was not diffident about including an attack on his client's "intangible rights" conviction as one of the grounds for appeal (*Holzer I,* 816 F.2d at

"cause." After the already-quoted language stating criminal defendants are "bound by the tactical decisions of competent counsel" (468 U.S. at 13, 104 S.Ct. at 2909)—at least "absent exceptional circumstances" (*id.*)—the Court went on to say (*id.* at 14, 104 S.Ct. at 2909) (citations omitted):

> In general, therefore, defense counsel may not make a tactical decision to forgo a procedural opportunity—for instance, an opportunity to object at trial or to raise an issue on appeal—and then, when he discovers that the tactic has been unsuccessful, pursue an alternative strategy in federal court.... Procedural defaults of this nature are, therefore, "inexcusable," ... and cannot qualify as "cause" for purposes of federal habeas corpus review.[7]

Accord, *Smith*, 477 U.S. at 534, 106 S.Ct. at 2666.

All this would lead this Court to adhere to its *Gill* ruling on the absence of "cause," a ruling that would apply to Ginsburg on an even stronger—an a fortiori—basis. One factor alone has led this Court to a different result—a factor identified by one of the Courts of Appeals that has reached the contrary outcome. *Shelton*, 848 F.2d at 1490 n. 4 has said this:

> In view of the Court's conclusion in *Davis*, 417 U.S. at 346–47, 94 S.Ct. at 2305, that conviction and punishment for conduct that is not criminal would undoubtedly result in a complete miscarriage of justice presenting exceptional circumstances, a compelling argument can be made that the claim raised in the instant proceedings is available in a section 2255 motion without regard for whether the petitioner had cause for any default.

In partial support of that proposition *Shelton* refers to our Court of Appeals' dictum in *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985):

> About all that can be offered as a generalization is that if the defendant can show that under no possible view of his conduct was he guilty of a federal crime, the conviction will be set aside as "otherwise subject to collateral attack" under 28 U.S.C. § 2255.

And cf. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986):

> Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.

*McNally* teaches that a defendant convicted of mail fraud where there has been no deprivation of money or property is someone who has been found guilty even though he or she has not committed a federal crime. In that circumstance this Court is prepared to bypass what it would otherwise view as the absence of "cause." [8] It therefore proceeds to the "prejudice" element of the *Frady* analysis.

### 2. Actual Prejudice

As the end of the preceding section has indicated, conviction and punishment for an act that the law does not make criminal is "a paradigm miscarriage of justice" (*United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988)). If Ginsburg was convicted under a theory *McNally* knocked out (and thus convicted of a non-crime), he has suf-

---

309–10), though the doctrine was if anything better entrenched then than at the time of Ginsburg's appeal. Even though that attack was unsuccessful the first time around, defendant Holzer ultimately (post-*McNally*) obtained a reversal of his mail fraud convictions (*Holzer II*, 840 F.2d 1343).

**7.** [Footnote by this Court] Though *Reed* spoke in the Section 2254 context (where the "alternative strategy" is one that goes to the state court first, then a federal court), the concept of law-

yer strategy would apply with equal force to Section 2255 (where the initial direct appeal might be thought by counsel to stand a better chance if an argument is omitted, and then the omitted argument is later advanced via habeas proceedings).

**8.** Whichever way the "cause" issue or this latest question is resolved, the problem is an extraordinarily knotty one. Certainly it deserves review by higher authority.

fered "actual prejudice" in the *Frady* sense.[9]

*Wellman,* 830 F.2d at 1462 requires this Court to:

> look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense.

That calls for a two-pronged inquiry:

> 1.  whether the indictment states an offense in light of *McNally–Carpenter;* and
>
> 2.  whether, in light of the instructions, the jury *"necessarily* found the existence of a scheme to defraud someone of 'property' within the meaning of *McNally"* (*Keane,* 852 F.2d at 205 (emphasis in original)).

### A.  Validity of the Indictment

In *McNally–Carpenter* terms the indictment charging Ginsburg had to allege someone was deprived of "property"—be it tangible or intangible property.  For that purpose, Ginsburg's Section 2255 challenge stands on a different footing from a direct appeal scenario.  *Burchfield v. United States,* 544 F.2d 922, 924 (7th Cir.1976) (citations omitted) has said:

> In the § 2255 situation the indictment cannot be questioned unless it is so defective on its face as not to charge an offense under any reasonable construction.... The type of facial defect required to raise successfully a challenge in this situation has been characterized as "obviously defective." ... In one of the more recent cases enunciating the standard, ... the court referred to previous cases and the standards established. The defect must be of a fundamental nature, the sufficiency of an indictment is not subject to collateral attack save in exceptional circumstances, and the indictment must be so defective on its face as not to charge any offense under any reasonable construction.

Even so, the United States understandably faces substantial difficulties post-*McNally.*  With the "intangible rights" theory having been so firmly entrenched in this Circuit, prosecutors regularly drafted pre-*McNally* indictments in those terms (just as district judges, including this one, made evidentiary and other trial rulings on the same basis).  Now courts are called upon to indulge a type of post-hoc "what if" analysis of previously-litigated cases, deciding whether the indictments and convictions would have survived a wholly different climate.  Little wonder that the Court of Appeals' opinions essaying such reconstructive efforts are not always easy to reconcile.

In this instance the indictment begins in typical pre-*McNally* fashion (¶ 7,[10] emphasis added):

> 7.  Beginning at least as early as November, 1975, the exact date being unknown to the Grand Jury, and continuing until the date of this indictment, in the Northern District of Illinois, Eastern Division,
>
> RICHARD A. GINSBURG, and THEODORE J. SCHMIDT,
>
> defendants herein, together and with other co-schemers both known and unknown to the Grand Jury, devised and intended to devise a scheme:
>
> (a)  to defraud the Board of Appeals and the citizens of Cook County of their right to loyal, faithful, and honest services of Donald Erskine, Jimmie Smith, Thomas Lavin, Stephen Gorny and others in the performance of acts related to their public employment;
>
> (b)  to defraud Cook County and its citizens, its public officials, and its public

---

**9.**  Although the Supreme Court has "refrained from giving 'precise content' to the term 'prejudice'" (*Frady,* 456 U.S. at 168, 102 S.Ct. at 1594) it can hardly be gainsaid that a conviction for an act the law does not make criminal violates due process.  And a due process violation is a classic instance of "actual prejudice" (see, e.g.,

*Frady,* 456 U.S. at 169, 102 S.Ct. at 1595, quoting from the unanimous decision in *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)).

**10.**  All references to the indictment will simply take the form "¶ —."

employees of their right to have the business of the Board of Appeals conducted honestly, fairly, and impartially, free from corruption, collusion, partiality, dishonesty, bribery and fraud; and

(c) to defraud Cook County and its citizens of their right to have real estate property taxes assessed and collected free from the influence of corruption, collusion, partiality, dishonest[y], bribery and fraud; *which scheme was in substance as follows:*

Those allegations clearly have their origins in the now prohibited "intangible rights" theory, and Government Mem. 12 admits that. But that does not end the inquiry, for this Court must continue to "look to the substantive allegations" (*Wellman,* 830 F.2d at 1462) to see if they "charge any offense under any reasonable construction" (*Burchfield,* 544 F.2d at 924).[11] And *Keane,* 852 F.2d at 205 (citing to *Wellman*) makes it clear that:

An indictment adverting principally to rights to faithful service still may lead to a valid conviction if the prosecution shows that the defendant defrauded someone out of property, including intangible property.

Were this Court writing on a clean slate, it would find the Ginsburg indictment sufficient. As the emphasized language and the colon in the ¶ 7 quotation reflect, the later paragraphs in the same count must also be looked at in defining the scheme (that is the normal meaning of "which scheme was in substance as follows"). And ¶ 8 says the Ginsburg–Schmidt law practice before the Board (charged as "part of the scheme to defraud") was:

for the purpose of obtaining real estate property tax assessment reductions on behalf of their clients.

To implement their scheme, ¶ 12 says Ginsburg and Schmidt "caused [Board employees] to fraudulently process complaints filed at the Board of Appeals by RICHARD A. GINSBURG and THEODORE J. SCHMIDT on behalf of their clients and to fraudulently grant real estate property tax assessment reductions on those complaints." That same ¶ 12 goes on to charge that those Board employees:

fraudulently reduced assessments in approximately 650 cases filed on behalf of the clients of defendants RICHARD A. GINSBURG and THEODORE J. SCHMIDT. Said fraudulent assessment reductions totaled in excess of $20 million.

Finally ¶ 14 says:

the real estate assessment reductions which were obtained pursuant to the scheme to defraud were maintained on certain properties by the Assessor of Cook County and by the Board of Appeals for up to three succeeding years.

Certainly Cook County ("County") has a property right in its assessed taxes. Under the allegations in the indictment, the fraudulent reductions in the assessments on the properties of Ginsburg's clients reduced their taxes ratably. If that had cost County money, it would have constituted a deprivation of "property" (see *United States v. McManigal,* 1988 U.S. Dist. LEXIS 12004, at 4 (N.D.Ill.) [1988 WL 116857], relying on *Keane,* 852 F.2d at 205).[12]

But that is not the way the real estate tax system works. Real estate taxes are a

---

11. See also *United States v. Bailey,* 859 F.2d 1265, 1275–76 (7th Cir.1988), quoting *Keane,* 852 F.2d at 205:

Even though each specific charge is couched in "intangible rights" language, the substantive allegations in each mail fraud count charge a "scheme that had substantial potential to take other people's property by fraud," and therefore state offenses under *McNally.*

12. That conclusion is buttressed by Ill.Rev.Stat. ch. 120, ¶¶ 697 (real property taxes are a prior and first lien on the property) and 705 (penalty interest is imposed on unpaid real estate taxes).

Imposition of such an interest penalty assumes an underlying property right. For instance, *Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950) held a federal taxpayer was not entitled to a refund of interest assessed on a claimed tax deficiency. Specifically the Court said, *id.* at 566, 70 S.Ct. at 389:

For that period the taxpayer, by its failure to pay the taxes owed, had the use of funds which rightfully should have been in the possession of the United States.

That smacks of a property right in the taxing body.

function of three separate but related factors: [13]

1. the total revenue ("TR" for "total revenue") County has determined is necessary to meet its operating budget for the fiscal year;

2. the sum of the equalized assessed valuations of all the properties within County's tax base ("TAV" for "total assessed valuations"); and

3. the tax rate ("r" for "rate"), which is determined by dividing the total revenue by the total assessed valuations:

$$r = \frac{TR}{TAV}$$

Total revenue, because it is determined in advance, must of course remain constant in setting the tax rate (TR = TAV × r). What that means is that a reduction in the assessed valuations of Ginsburg's clients' properties—because it also reduces TAV—increases tax rate r. Though County would thus lose nothing in total revenue as the result of Ginsburg's fraudulent scheme, all County taxpayers other than Ginsburg's clients would end up paying more than they would have but for that scheme.

In sum, two possible approaches to the "money or property" issue would appear to sustain the indictment:

1. If County's right to collect taxes from Ginsburg's clients (viewed alone, without taking into account the right to collect from all other taxpayers) is considered the relevant "property" interest, the charged scheme would deprive *County* of that property.[14]

2. If taxpayers other than Ginsburg's clients are considered to have the relevant "property" interest in the amount of their own real estate taxes, the charged scheme would deprive *them* of part of that property.[15]

Whatever the conceptual difficulties with either or both those theories, they appear to find support in the cases (*Lynch, Carter* and *McManigal* in the same tax assessment fraud context; and cf. *Bailey*, 859 F.2d at 1275–76).

That final thread might have been expected to lead us out of the *McNally–Carpenter* labyrinth (at least so far as the Ginsburg indictment is concerned). But the thread of logic (if that is indeed what has been spun up to now) is snapped by the Court of Appeals' recent decision in *Magnuson*. That case, like this one, involved a charged scheme to obtain fraudulent reductions in property tax assessments —this time in Marion County, Indiana. After examining the indictment there, *Magnuson*, 861 F.2d at 168 concluded:

In light of *McNally*, it is clear that the indictment failed to allege a proper basis for a mail fraud conviction.

*Magnuson*'s indictment was strikingly similar to that against Ginsburg. Indeed, the charging paragraphs of the *Magnuson* mail fraud counts (Count 2 ¶ 2, Count 3 ¶ 2 [also incorporated by reference into Count 4] and Count 6 ¶ 5) track the "intangible rights" language of the Ginsburg mail fraud counts (¶ 7, quoted earlier in this opinion) almost word for word—even to the

---

**13.** What follows is a bit oversimplified, because one factor (a property's equalized assessment) is the product of two sub-factors: the actual property assessment times County's equalization factor. Because the concept of equalization is not relevant here, the text discussion will treat the two sub-factors as a single combined element.

**14.** That splintered approach to County's property interest in total revenue, though it may lack something in logic, is lent credibility by *United States v. Lynch*, 699 F.2d 839, 845 (7th Cir.1982) and *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir.1985). Both cases rejected a zero-sum argument (see also n. 15) as to fraudulent real estate tax assessment schemes involving Board em-

ployees (schemes identical to that charged against Ginsburg): *Lynch* in the context of a criminal conviction and *Carter* in a RICO context.

**15.** As if the analysis were not complicated enough, that alternative introduces still another issue. As ¶ 7 reads, the defrauded parties are said to be "Cook County and its citizens." If "citizens" were viewed as embracing the Ginsburg–Schmidt clients as well as the taxpayers whose taxes were assessed honestly, no net deprivation of property would be involved (what other citizens lost, the Ginsburg–Schmidt clients gained—a zero-sum situation). As things turn out, that added complexity need not be sorted out.

extent of following that language with the identical clause:

> which scheme was in substance as follows:

Then the next paragraph of each *Magnuson* count, like Ginsburg ¶ 8 (also quoted earlier), charged that the lawyers' purpose (again "part of the scheme" to defraud) was to obtain assessment reductions.[16] Finally each *Magnuson* count (Count 2 ¶¶ 4 and 5, Count 3 ¶¶ 4 and 5 [again incorporated by reference into Count 4] and Count 6 ¶¶ 7–9) matched very closely the earlier-quoted Ginsburg charges that the scheme sought to obtain *fraudulent* reductions.[17]

Thus read as a whole, the *Magnuson* indictment would seem to charge a scheme to deprive someone of money or property in precisely the same sense as already discussed at length in this opinion. Yet *Magnuson*, 861 F.2d at 168 (emphasis in original) held:

> Totally absent from the 24 page indictment are any allegations that Marion County, Center Township or the people of the localities lost any money or property. Cf. *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir.1988), where the indictment contained a combination of readily separable theories. The indictment in the instant case sought convictions *only* for the deprivation of intangible rights.

Because the *Magnuson* indictment appears legally indistinguishable from that involved in this case, the just-quoted conclusion that the indictment there failed to state an offense forces the same conclusion here.

To be sure, *Magnuson* poses difficulties not only in how it characterizes the indictment there but also in how it seems to depart from other Seventh Circuit teaching as to the examination of indictments (particularly *Wellman*'s instruction to "look to the substantive allegations" and *Burchfield*'s command to see if the indictment "charge[s] any offense under any reasonable construction").[18] And *Magnuson* seems wrong in its emphasis on the absence of allegations (or of proof, *id.* at 168–169) that tax revenues were actually *lost* as a result of the scheme. It is black-letter law that a scheme or conspiracy is to be tested by the *intent* of the schemers or conspirators to accomplish the unlawful purpose, whether or not they succeed. *Keane*, 852 F.2d at 205 (emphasis in original) put the matter succinctly:

> But the mail fraud statute proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed in raking off cash, a point no less valid today than when emphasized on direct appeal....

No proof of *actual* deprivation of money or property should be demanded, so long as the jury (properly charged, to be sure) could rationally have drawn the inference beyond a reasonable doubt that such a result was intended by the schemers. And surely the jury in *Magnuson*, like the jury here, could have determined the tax lawyers were bribing the tax officials not for their health but to obtain favorable (and

---

16. This paragraph's summary of the charges in the *Magnuson* indictment is drawn from this Court's review of the *Magnuson* record on appeal (Ex. B to the Motion To Vacate Sentence and Judgment filed by Magnuson's co-defendant Mohr, because those charges were not reproduced in the brief Court of Appeals opinion in *Magnuson.*

17. Such parallel construction is not at all surprising. As already stated, the "intangible rights" approach to mail fraud was devised in this Circuit—in fact, in this Northern District of Illinois. Once the doctrine had gained judicial sanction, prosecutors everywhere in the Circuit understandably structured their "intangible rights" indictments in the accepted fashion, which essentially became a standard format.

18. In that respect, it is surely worth noting that the post-*Magnuson* opinion in *Folak*, 865 F.2d at 113 (the Court of Appeals' most recent pronouncement in this area) identifies, as sustainable post-*McNally*, not only indictments that contain "readily separable" or "easily separable" money-or-property allegations but also those (citing *Wellman* among other cases):

> where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right....

Though Ginsburg's indictment (like that in *Magnuson*) does not fit the first category, both the Ginsburg and *Magnuson* indictments do appear to satisfy the second.

fraudulent) results to which the lawyers' clients were not entitled.

But if the issue is to be revisited, it must be by the Court of Appeals and not by a district court bound by *Magnuson.* In light of that case, this Court must hold (albeit with reluctance) that the indictment here failed to charge mail fraud offenses cognizable under *McNally–Carpenter.*

That conclusion obviates any need to inquire whether the jury necessarily found the existence of a scheme to deprive someone of money or property (*Keane,* 852 F.2d at 205; *Wellman,* 830 F.2d at 1462–63). But because *Magnuson* did use the jury instructions and the evidence presented at trial in that case to support its conclusion, this opinion will explore that question as well.

B.   Significance of the Jury's Verdict

Whenever a challenged pre-*McNally* indictment sounded in "intangible rights" terms, *Bailey,* 859 F.2d at 1276 (adapted to this case) says the court reviewing the conviction:

> must examine the jury instructions, along with the evidence and arguments at trial to see if the jury necessarily convicted [Ginsburg] of conduct that constituted an offense.

That task will be essayed next.

In the "elements" instruction on the mail fraud charges, Ginsburg's jury was told the government had to prove two propositions beyond a reasonable doubt (Government Mem. Ex. C, at 65):

> First, that the defendant that you are considering knowingly and intentionally, devised, intended to devise, or participated in the scheme to defraud that is described in the indictment, and second, that for the purpose of carrying out that scheme or attempting to do that, the defendant that you are considering caused the United States Mails to be used in the manner that is charged in the particular count. You will look at each count separately, see what it charges, and see whether, in your judgment, the government has proved that proposition beyond a reasonable doubt.

"Intent to defraud" and "scheme to defraud" were defined this way (*id.* at 66, 68):

> That phrase, intent to defraud used in the charges of mail fraud in Counts 1 to 19, and those counts are incorporated into Count 20 as well, means that the acts charged were done knowingly with the intent to deceive the Board of Appeals, Cook County, and Cook County citizens, public officials and public employees in order to cause the loss of the loyal, faithful, or honest services of the Board of Appeals employees Donald Erskine, Jimmie Smith, Thomas Lavin, James Woodlock and Stephen Gorny in their performance of their official duties, or in order to cause the loss of the honest, fair or impartial assessment and collection of real estate property taxes.

> \*    \*    \*    \*    \*    \*

> A scheme to defraud under this mail fraud statute, means some plan to deprive another of something of value by fraudulent means.

And the sole example of a "scheme to defraud" given to the jury in the instructions was this (*id.* at 68):

> A scheme by bribery of public officials to cause them to grant favorable results to people seeking those results, may constitute a scheme to defraud within the meaning of the mail fraud statute, and that is so whether or not the results obtained through the bribery scheme could have been obtained through some honest means.

As the earlier discussion reflects, the reference back in those instructions to "the scheme to defraud that is described in the indictment" has been read by *Magnuson* as not charging a "money or property" deprivation scheme. Yet it is plain that the jury in this case could readily have found Ginsburg defrauded someone out of "money or property." Given the jury instruction that a bribery scheme seeking to obtain favorable results for the lawyers paying the bribes would constitute a "scheme to defraud" under the mail fraud statute, and given the evidence before it, the jury could surely have concluded that:

1. Ginsburg engaged in a scheme to bribe Board employees.

2. That scheme's purpose was to obtain favorable results from Board for Ginsburg's clients.

3. Those intended favorable results were fraudulent reductions in tax assessments, and in turn fraudulent reductions in taxes, for Ginsburg's clients.

4. Any such intended reductions in taxes were intended "to deprive another of something of value [money] by fraudulent means" under the extended analysis earlier in this opinion.

Under that line of reasoning Ginsburg would indeed have been convicted of a scheme to deprive someone of property—of money. Such a conviction would certainly survive *McNally–Carpenter*.

But the lesson of *Bailey, Keane* and like post-*McNally* cases is that such a possibility is not enough. *Necessity* is the hallmark of a valid conviction: Could the jury have found Ginsburg guilty of an "intangible rights" scheme (one seeking to deprive County and its citizens of honest government) without also *necessarily* having found the existence of a scheme to deprive someone of money or property? Nor is that question foreclosed by the unquestionable fact that the "intangible rights approach was such a centerpiece of the trial" (*Keane*, 852 F.2d at 205). This opinion turns, then, to that inquiry.

First, it is true that "intent to defraud" was defined in purely "intangible rights" language. This Court's instructions referred to "the loss of loyal, faithful, or honest services of the Board" and to "the loss of the honest, fair or impartial assessment and collection of real estate property taxes" (Government Mem. Ex. C, at 65). As might have been expected pre-*McNally*, no specific mention was made of any loss of money or property.

Second, "scheme to defraud" was defined (as in *Bailey* and *Wellman*) as "some plan to deprive another of something of value," but the term "value" was never defined in so many words. In the context of that instruction, the jury might have equated "value" with "the loss of the loyal, faithful, or honest services of the Board"—though that would hardly seem a normal reading of the term "value" by a lay reader.

Indeed, immediately after that instruction this Court gave the jury its only specific example of a scheme to defraud (*id.* at 68):

A scheme by bribery of public officials to cause them to grant favorable results to people seeking those results may constitute a scheme to defraud....

As already noted, the jury's finding of such a scheme would certainly have produced a conviction sustainable under *McNally–Carpenter*.

*Wellman*, 830 F.2d at 1463 said of the instructions in that case:

[W]hat is crucial is that the "scheme to defraud" was not defined in such a way as to allow conviction for conduct which was not an offense.

And *Bailey* also upheld a conviction where, as here and as in *Wellman*, "scheme to defraud" was specifically defined in terms of "depriv[ing] another of something of value by fraudulent means" and where (859 F.2d at 1277):

Unlike *United States v. Holzer*, 840 F.2d 1343, 1346 (7th Cir.1988), nothing in the instructions specifically advised the jury that "intangible rights" could be "something of value" for purposes of finding a scheme.

It is equally true that no instruction here specifically said "intangible rights" could be "something of value." That might perhaps be viewed as a semantic quibble, because nothing in the instructions specifically negated that possibility either, and it must be remembered the search now under way is for what the jury must necessarily have done. What would control that issue for this Court (pace *Magnuson*) is the fact that there is no *other* scheme to defraud that the jury could possibly have found here. There was only one way in which County and its citizens were sought to be deprived of honest government—of the honest services of Board employees—and that was by Ginsburg's seeking to subvert

the tax assessment system by bribing those people to get favored treatment (that is, lower assessments) for Ginsburg's clients.

To put it simply, if there were indeed a scheme to defraud County and its citizens of intangible rights, it necessarily took the form of a money-or-property deprivation scheme of the kind described earlier in this opinion. Those two were inextricably intertwined, and the jury could not have found the former without finding the latter beyond a reasonable doubt. But for *Magnuson*, the inquiry into the instructions would yield the same answer as in *Wellman* and *Bailey* (where the jury was given the identical definition of "scheme" as meaning "some plan to deprive another of something of value"): a sustainable *McNally–Carpenter* conviction.

Just a few words should be added about one aspect of the evidence (or more accurately the non-evidence) in the case. As might have been expected in the pre-*McNally* era, this Court—faithful to the "intangible rights" teachings of our Court of Appeals—tailored its evidentiary rulings to what was then established law. At trial Ginsburg's counsel wanted to go through a host of the property assessment files to show that the ultimate results actually obtained could be justified on some legitimate valuation methodology. This Court rejected that evidence as irrelevant to a scheme to deprive County and its citizens of an honestly administered tax assessment system—one free from the presence of Ginsburg's bribes. Of course that response was not tailored to the money-or-property deprivation regime announced only later in *McNally*.

But the answer would seem to be the same in those terms even in light of *McNally*. It has already been pointed out that it is conventional wisdom that a scheme need not be successful to be prosecutable. Where the scheme is one to bribe public officials to obtain favorable results, that is enough for conviction whether or not those results were obtained. Consequently a fraudulent briber who uses the mails to implement that scheme should not be able to escape guilt by showing that the same results might have been obtained honestly.

In sum, this opinion's separate look at what the Ginsburg jury did—if divorced from *Magnuson*—would indicate a sustainable set of mail fraud convictions. However, the parallel between *Magnuson* and this case (with the reference back, in this Court's jury instructions, to the indictment for the description of the "scheme to defraud") appears to taint the jury verdict here as well.[19]

\*   \*   \*   \*   \*   \*

Before our Court of Appeals' recent pronouncement in *Magnuson*, Ginsburg's mail fraud convictions would have withstood the onslaught of *McNally* (as clarified by *Carpenter* and as applied in the series of Seventh Circuit opinions that have engaged in the revisionist historical inquiry forced by *McNally*). *Magnuson* compels a different answer. Though the issue certainly should be looked at by higher authority, this Court must conclude Ginsburg's mail fraud con-

**19.** This Court's review of the *Magnuson* jury instructions (Ex. C to the Mohr motion, see n. 16) discloses one significant difference from the instructions given in this case. After the *Magnuson* jury was given much the same "elements" instruction as in this case (one referring back to "the scheme to defraud as described in the indictment"), that jury was not told that a "scheme to defraud" meant depriving someone of "something of value"—as was told to the jury in this case, and as was also present in *Bailey*'s and *Wellman*'s upholding of mail fraud convictions. Instead the *Magnuson* jury was specifically instructed that the scheme's object need *not* be money or tangible property—essentially an "intangible rights" instruction to match the "intangible rights" component of the indictment:

> The word "scheme" as used in the statute just read, includes any plan or course of action intended to deceive others. The object of the scheme need not be money or any form of tangible property. A scheme to defraud the citizens of a governmental unit can come within the meaning of "scheme to defraud" as set forth in the mail fraud statute.

Viewed only in terms of the jury instructions, then, this case can fairly be distinguished from *Magnuson*, so as to support a different result in reliance on *Wellman* and *Bailey*. But because *Magnuson* controls this case in terms of the indictment (and because "good" instructions cannot cure a "bad" indictment), such a possible distinction becomes a moot issue.

victions were unsustainable in money-or-property terms. They are therefore vacated.[20]

### RICO Conviction

Ginsburg was also convicted of one count of racketeering under RICO, with the charged predicate acts comprising (1) the multiple acts of mail fraud charged in the first 19 counts and (2) three separate acts of bribery in violation of Illinois law. Ginsburg Mem. 1—10 to 12 urges dismissal of the RICO count as well. Essentially Ginsburg argues that because the jury returned a general "guilty as charged" verdict, there is no way to know which predicate acts the jury used—the tainted acts of mail fraud or the bribery acts (which would not suffer the same flaw).

All the government says in response is this (via a footnote, Government Mem. 17 n. 8):

> If this Court vacates the mail fraud convictions and the racketeering conviction (on the grounds that the alleged mail frauds wire [sic—should be "were"] used as predicate racketeering acts), it is the government's position that the proper order would be for a new trial, so the defendant could be retried on the racketeering count if the government so elected. *See United States v. Holzer*, 840 F.2d 1343, 1352 (7th Cir.1988).

That implicit concession that if the mail fraud counts go, the racketeering conviction also falls is plainly correct, for (*Cramer v. Fahner*, 683 F.2d 1376, 1379 (7th Cir.1982) (citation omitted)):

> Where a verdict is supportable on one ground but not another, and it is impossi-

ble to tell which grounds the jury selected, the conviction is unconstitutional.

*Holzer II*, 840 F.2d at 1349–52 indeed counsels the vacation of Ginsburg's RICO conviction.

As to whether Ginsburg remains vulnerable to a retrial on the RICO charge, that too is settled by the affirmative answer in *Holzer II, id.* (although our Court of Appeals ordered that result without expressly discussing the double jeopardy issue). This Court will follow that mandate without further examination of that issue (see n. 20).

Accordingly Ginsburg's RICO conviction is also vacated. This Court will await the government's decision as to whether it wishes to retry him on that charge.

### Conclusion

Based on our Court of Appeals' recent *Magnuson* decision, Ginsburg's Section 2255 petition must be granted. His conviction is vacated in its entirety—on all 19 counts of mail fraud under *Magnuson*'s reading of *McNally* and on the single RICO count via a kind of infectious invalidity. This case is set for a status hearing at 9 a.m. January 24, 1989 to discuss its future.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's January 10, 1989 memorandum opinion and order (the "Opinion") dealt at great length with the 28 U.S.C. § 2255 ("Section 2255") habeas corpus petition filed by Richard Ginsburg ("Ginsburg") to challenge his mail fraud and mail-fraud-related convictions in light of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), as further ex-

---

**20.** It is an interesting—and difficult—question whether the government could retry Ginsburg on a post-*McNally* theory without violating the Double Jeopardy Clause. Judge Posner framed the question this way in *Holzer II*, 840 F.2d at 1349:

> whether we are reversing for insufficiency of the evidence (in which event retrial is barred) or for trial error (in which event it is permitted)?

On that score the Supreme Court's recent opinion in *Lockhart v. Nelson*, —— U.S. ——, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) bears exami-

nation. *Lockhart* held that when a reviewing court determines a defendant's conviction must be set aside because certain evidence was erroneously admitted against him, and further finds that once that evidence is discounted there is insufficient evidence to support a conviction, retrial is not prohibited by Double Jeopardy so long as the sum of the evidence offered and admitted at trial—whether erroneously or not—would have been sufficient to sustain a guilty verdict. In any event, the new-trial issue has not been posed to this Court.

plicated in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) and a group of Seventh Circuit decisions applying the doctrine of those cases. Such extended treatment was occasioned primarily by our Court of Appeals' decision in *United States v. Magnuson*, 861 F.2d 166 (7th Cir.1988), which seemed an aberration from the developing post-*McNally* case law—not in terms of the legal principles announced, but in the factual matrix to which those principles were applied.

This supplement to the Opinion is issued sua sponte in light of our Court of Appeals' newest pronouncement in this area in *Moore v. United States*, 865 F.2d 149 (7th Cir.1989). *Moore* appears to demonstrate even more forcefully the puzzling nature of the *Magnuson* self-characterization and result, thus suggesting even more strongly the desirability of revisiting the matter in the context that Ginsburg's case presents. And such revisitation may be particularly appropriate because Ginsburg's is one of a host of indictments and convictions generated by the widespread pattern of fixing Cook County real estate tax assessments, many or all of which would appear vulnerable under *Magnuson*.[1]

*Moore* reversed an order in which this Court's colleague Honorable Paul Plunkett had vacated the defendant's mail fraud conviction because of *McNally*. Because much of the *Moore* opinion might have been written specifically for this case, a comparative analysis of the legal situations in *Moore*, *Magnuson* and this case is both constructive and instructive.

Though *Moore*'s fraudulent scheme involved the Metropolitan Sanitary District of Greater Chicago, while Ginsburg fed at the Board of Tax Appeals trough, in both cases the evidence (discussed first in *Moore*, at 151–52) demonstrated a scheme that "involved a deprivation of money or property rather than merely intangible rights" (*id.* at 152). Opinion at 1317–18 analyzed that concept in some detail as it applied to the tax assessment fraud perpetrated by Ginsburg and others, demonstrating that "money or property" was implicated here as well.[2] But if that is indeed so as to *Moore* and this case, it appears to be so of *Magnuson* too.

As for the indictment (discussed next in *Moore*, at 152), *Moore*'s was startlingly parallel to that in this case. Both initially charged the scheme in terms of deprivation of honest government—as *Moore*, *id.* at 152 said after quoting the portion of the indictment there that was substantially comparable to Ginsburg's Indictment ¶ 7 (quoted in Opinion at 1316–17):

So far the indictment was obviously couched on a pre-*McNally* intangible rights theory.

But then the *Moore* indictment went on to allege the money-or-property aspects of the scheme. Opinion at 1317 explained how that was certainly true of the indictment here as well. But if that is indeed so as to *Moore* and this case, it appears to be so of *Magnuson* too.

Finally *Moore*, at 152–154 dealt with the jury instructions. If anything, the instructions this Court gave in this case were more conducive to a money-or-property con-

---

**1.** As Opinion at 1318–19 reflects, Cook County did not enjoy a monopoly on real estate tax assessment fraud. *Magnuson* stemmed from an identical assessment-fixing scheme in Marion County, Indiana—though this Court has no knowledge whether the practice was as pervasive in Indianapolis as it has been demonstrated to have been in Chicago by the numerous convictions (besides that of Ginsburg and his then law partner Theodore Schmidt).

**2.** To be sure, Opinion at 1322 referred to the evidentiary rulings by this Court (based on the then-firmly-entrenched "intangible rights" doctrine) that rejected Ginsburg's proposed proof as to the sustainability of the ultimate assessments

obtained from the Board. But as Opinion at 1322 pointed out, the Ginsburg scheme clearly *sought* to obtain lower assessments. And as Judge Cudahy's dissent in *Moore*, at 154 correctly points out:

And, of course, a scheme does not have to actually succeed in depriving a victim of money or property in order to fall under the mail fraud statute. *United States v. Dial*, 757 F.2d 163 (7th Cir.1985); *United States v. Reicin*, 497 F.2d 563 (7th Cir.1974). But it is necessary that the jury find that a deprivation of "money or property" was necessarily envisioned by the scheme. *McNally*, 107 S.Ct. at 2882.

viction than those in *Moore.* There the instructions read in relevant part (quoted in *Moore,* at 152):

> A scheme means some plan or course of action intended to deprive another of something of value *including intangible rights* (emphasis supplied).

> \*    \*    \*    \*    \*    \*

> The Metropolitan Sanitary District of Greater Chicago and the citizens of the Chicago Metropolitan area have an *intangible right* to the loyal, faithful and honest services of public employees and an *intangible right* to have the business of the Metropolitan Sanitary District conducted honestly, fairly and impartially, free from corruption, collusion, partiality, dishonesty, conflict of interest and fraud, and in accordance with the laws of the State of Illinois and the rules and regulations of the Metropolitan Sanitary District.

> A scheme to defraud the Metropolitan Sanitary District or the citizens of the Chicago Metropolitan area of these *intangible rights* may constitute a scheme to defraud within the meaning of the mail fraud statute. (App. 2 p. 7.) (Emphasis supplied.)

By contrast, here this Court's jury instruction definition of "scheme to defraud" spoke *only* of "something of value," *without* any "intangible rights" language (see Opinion at 1320). And as the next-quoted instruction in Opinion at 1320 reflects (see the further discussion in Opinion at 1321–22), the only example this Court gave the jury of a scheme to defraud was one that necessarily involved a money-or-property deprivation.

In those respects the instructions this Court gave Ginsburg's jury would seem less vulnerable to a *McNally*-style attack than those in *Moore*—and as the Opinion pointed out, than those in *Magnuson* as well. What appeared to this Court to compel adherence to *Magnuson* despite that difference was (1) the absolute parallel between the *Magnuson* indictment and Ginsburg's, (2) the proposition that " 'good' instructions cannot cure a 'bad' indictment" (Opinion at 1322 n. 19) and (3) the fact that

*Magnuson* overturned the convictions in that case.

In sum, *Moore* would seem to call for upholding Ginsburg's conviction—in one aspect, indeed, on what appear to be a fortiori principles. *Moore,* at 152 (citations omitted) distinguished itself from *Magnuson:*

> Since it is obvious that the MSD would lose money from the scheme portrayed in paragraphs 3–11 of the indictment and later consummated, the case differs from *Magnuson* . . ., where no money or property was lost. Instead Moore's scheme to defraud MSD of tangible property rights´was "easily separable" from the scheme to deprive it of its intangible rights, so that the indictment is sufficient to state an offense under the mail fraud statute.

But as the Opinion demonstrated in painstaking detail, that labeling of *Magnuson* as involving no deprivation of money or property looks like the result of the *Magnuson* court's having characterized its own facts in a way not wholly consistent with our Court of Appeals' opinions in such cases as *United States v. Wellman,* 830 F.2d 1453 (7th Cir.1987)—and now *Moore* as well.

Accordingly this Court's reluctance in adhering to the dictates of *Magnuson* has been deepened by *Moore.* Nonetheless, *Magnuson* taken at face value stands squarely in the path of Ginsburg's conviction. And faithfulness to the role of a District Court in the jurisprudential firmament thus continues to call for the conclusion reached in the Opinion: granting Ginsburg's Section 2255 petition and vacating his conviction in its entirety.

## SECOND SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

██ It is—and should be—extraordinary for a lower court's opinion to deliver essentially this message to its appellate court:

> This decision is rendered in response to what appears to be a directly controlling decision of your court that, though of very recent vintage, seems at the same time to be out of phase with other contemporary decisions from your court. It

would thus seem this decision ought to be reversed if it is to conform to the mainstream of your current decision law, but as a matter of jurisprudential responsibility that is for your court and not this one to decide.

Yet that has been the thrust of not one but two opinions and orders from this Court in this case: "Opinion I" issued January 10, 1989, granting the 28 U.S.C. § 2255 ("Section 2255") habeas corpus petition filed by Richard Ginsburg ("Ginsburg") and vacating his conviction in its entirety, and "Opinion II" issued January 23, 1989, reconfirming that decision despite the post-Opinion I Court of Appeals' opinion in *Moore v. United States.*[1] Now the extraordinariness of the situation must be compounded, for a still newer development in the law compels this Court's reversal of those earlier conclusions.

Last week—just four days after the issuance of Opinion II—our Court of Appeals issued its opinion in *United States v. Doe,* 867 F.2d 986 (7th Cir. 1989). On January 30 the United States filed a "Motion for Reconsideration" of Opinion I based on *Doe.* For the reasons briefly stated in this second supplement to Opinion I, this Court grants that motion, vacates Opinions I and II and dismisses Ginsburg's Section 2255 petition on the merits.[2]

As did Opinion II, this opinion will assume familiarity with Opinion I. It will also assume familiarity with Opinion II. Both those assumptions proceed on the premise that there is no need to reinvent either the wheel or any of its spokes by rehearsing what has already been treated at length in those opinions.

*Doe* has just now dealt with and upheld another indictment and conviction emerging from the identical corrupt pattern that spawned Ginsburg's—the widespread practice of bribery of employees of the Cook County Board of Tax Appeals by lawyers practicing before that Board, seeking to obtain lower tax assessments for the real estate owned by the clients of the corrupt (and corrupting) lawyers. In factual terms *Doe* necessarily presents a closer parallel to Ginsburg's case than the similar pattern of corruption in Marion County, Indiana that produced the conviction in *Magnuson* (which was the case that forced the conclusions reluctantly arrived at in Opinion I and Opinion II). And a brief review of *Doe* readily demonstrates that the factual parallel also extends to a direct parallel of the legally significant aspects of *Doe* with Ginsburg's case, thus calling for the same result here as in *Doe.*

*Doe,* at 987 shows that the initial portion of the mail fraud indictment there spoke only in "intangible rights" language, just as was true of Ginsburg's Indictment ¶ 7 (quoted in Opinion I at 988–89). Then *Doe,*

---

1. This opinion will retain the usage of all defined terms in Opinions I and II (including the names of earlier cases from our Court of Appeals), without repeating either the definitions or the citations contained in Opinions I and II.

2. Nothing in the government's current motion *identifies its source in terms of the Federal* Rules of Civil Procedure ("Rules"), made most appropriately applicable to the current proceeding under Rule 12 of the Rules Governing Section 2255 Proceedings in the United States District Courts ("Section 2255 Rules"). Motions for reconsideration are unmentioned in the Rules, but to the extent they address judgment orders they must find legitimacy either in Rule 59(e) or in Rule 60(b). By now Opinion I has become final, with the ten days provided by Rule 59(e) (made 15 calendar days by Rule 6(a)) having elapsed. That then means any proposed reconsideration must take place under the limitations of Rule 60(b)(6), as to which the ordinary rule is that post-judgment changes in the law should not affect the posture in which the judgment has left the parties. But that rule is not set in concrete—as 11 Wright and Miller, *Federal Practice and Procedure: Civil* § 2864, at 223 (1973) (footnotes omitted) puts it:

> It has been said that a change in the law is not enough to permit reopening a judgment under Rule 60(b)(6). Generally that should be true, but this is not an inexorable rule, as indeed the Supreme Court has recognized.

Because Ginsburg's rights in this post-conviction-remedy proceeding are a function of the *current* wisdom as to the meaning and effect of *McNally* and *Carpenter,* this is a singularly appropriate case for applying the most recent teaching from our Court of Appeals. Surely no constructive purpose would appear to be served by this Court's staying with a demonstrably incorrect result, when an appeal from such a decision appears almost certain to compel its reversal based on new and controlling authority.

slip op. at 5 further quotes the money-or-property aspect of the indictment in that case—allegations that correspond directly to the allegations in Ginsburg's Indictment ¶¶ 8, 12 and 14 (quoted in Opinion I at 1317).

Indeed *Doe,* at 988 n. 1 says of those money-or-property allegations:

> This paragraph distinguishes this indictment from another indictment recently considered by this circuit in *Magnuson v. United States,* 861 F.2d 166 (7th Cir. 1988). In *Magnuson,* defendants were convicted of a scheme similar to the one in which Gorny engaged. The indictment alleged only an intangible rights violation. *Id.* at 168. For this reason, we affirmed defendants' motion to vacate their sentences pursuant to 28 U.S.C. § 2255. In the case before us now, the indictment included not only "intangible rights" language, but also the substantive allegation that Gorny received and accepted bribes from attorneys who appeared before the Board in return for which Gorny reduced the tax assessments of individuals represented by those attorneys.

As it happens, that statement about the *Magnuson* indictment is an accurate reflection of what the *Magnuson* court *said* about the indictment there, but not of how the *Magnuson* indictment really read: In fact *Magnuson did* contain substantive money-or-property allegations precisely equivalent to those in *Doe* and in this case. Although Opinion I at 1318 did not quote those corresponding *Magnuson* indictment allegations, it cited them paragraph by paragraph based on this Court's review of the *Magnuson* record on appeal (see Opinion I at 1319 n. 16). Thus *Magnuson* as well as this case actually involved an indictment that, read under the standards *Doe* (and other cases) have announced and applied, spoke specifically in money-or-property terms. But what of course matters for current purposes is not what *Magnuson* actually involved, but rather what the *Doe* panel *believed* it involved.[3]

Accordingly *Doe* has effectively removed *Magnuson* as an impediment to this Court's otherwise-desired adherence to the principles of *Wellman, Moore* and now *Doe.* All that remains is to tick off the few differences between *Doe* and Ginsburg's case to demonstrate that they are without legal significance:

1. *Doe* is a coram nobis case, while this one has been brought under Section 2255. But as *Doe,* at 988 reflects in describing the conditions required to justify issuance of the writ of error coram nobis, the part of the inquiry in that case relating to the Section 2255 standards applies with equal force here. And nothing contained in the other (and sometimes more stringent) criteria for coram nobis relief distinguishes *Doe* from this case in any outcome-determinative way.

2. Like the jury instructions in *Magnuson,* those in *Doe* (see discussion in at 989–90) are really *less* sustainable in money-or-property terms than the jury instructions this Court gave here (see Opinion I at 1320, Opinion II at 1325). Whereas the *Doe* instructions were held erroneous (slip op. at 990), once the hurdle of Ginsburg's indictment has been overcome the instructions given to Ginsburg's jury pose no such problem.

3. As for proof, what was presented to the jury in *Doe* unquestionably showed bribes and fraudulently lowered real estate tax assessments (*id.*). In this case the proof before the jury was of a scheme unquestionably aimed at the same result[4]—evidence supporting

---

**3.** This should not at all be misunderstood as implying any criticism of *Doe*'s quoted footnote 1 in its characterization of the *Magnuson* case. After all, a subsequent appellate panel is entitled to accept at face value what a prior decision has said about the record in that case, without having to go back to verify the accuracy of that description. This Court did obtain the record in *Magnuson* for comparison purposes because it was so recent and apparently so close a prece-

dent when Opinion I was written. But that kind of checking cannot reasonably be expected of a later panel deciding another case in the Court of Appeals—which is not bound by law, as is a District Court, to follow one of its earlier decisions.

**4.** As Opinion I at 1320 reflects in quoting part of this Court's jury instructions, one of the corrupt Board employees involved in Ginsburg's own fraudulent tax assessment reduction activities

Ginsburg's conviction of the scheme beyond a reasonable doubt, whether or not the scheme was proved to have been (see Opinion I at 1319–20, 1320, 1322; Opinion II at 1324 & n. 2, quoting Judge Cudahy's statement of that unquestioned proposition in the course of his *Moore* dissent).

In sum, our Court of Appeals has now scotched any necessity for this Court to follow *Magnuson* because of the perceived *factual* parallel between that case and this one (a parallel that existed in fact, despite the different characterization that the *Magnuson* panel gave to the case before it). *Doe* plainly controls this case. With all the alacrity the situation commands, this Court departs from its prior reluctant adherence to *Magnuson*. It grants the government's motion for reconsideration, vacates the conclusions reached in Opinions I and II, finds no evidentiary hearing is required (see Section 2255 Rule 8(a)) and dismisses Ginsburg's petition on the merits.

was the selfsame defendant who has just lost his appeal in *Doe*—Stephen Gorny.